[No. G000207. Fourth Dist., Div. Three. Apr. 29, 1985.]

PACIFIC MUTUAL LIFE INSURANCE COMPANY,
Plaintiff and Respondent, v.
COUNTY OF ORANGE et al., Defendants and Appellants.

1142

## COUNSEL

Adrian Kuyper, County Counsel, and Richard D. Oviedo, Deputy County Counsel, for Defendants and Appellants.

Gibson, Dunn & Crutcher, Richard G. Duncan, Jr., and Joseph P. Busch III for Plaintiff and Respondent.

## OPINION

**TROTTER, P. J.**—Defendants, the County of Orange and the City of Newport Beach (hereafter collectively, the County) appeal from a judgment in favor of plaintiff, Pacific Mutual Life Insurance Company (Pacific), on Pacific's complaint for refund of property taxes paid with respect to the tax year 1977-1978.

The property involved is a five-story office building on Newport Center Drive in Newport Beach which is owned by Pacific and used as its corporate headquarters. The building, which is approximately 546,096 square feet in size, was built between 1971 and 1973, at an approximate cost of $14,308,328. It has a unique architectural style, akin to an inverted pyramid, and incorporates a central atrium which contains a 60-foot mural column with a fountain at its base. The lien date for property tax purposes was March 1, 1977. As of that date, the Orange County Assessor (the Assessor), using the reproduction or cost replacement method, determined the building's full cash value at $21,067,047.[1]

In 1976 the Assessor commenced an audit of Pacific's books and records pursuant to Revenue and Taxation Code section 469.[2] As a result of the audit, on June 20, 1977, the Assessor levied escape assessments for the 1973-1974 through 1976-1977 tax years. The tax imposed as a result of the escape assessments was $25,551.38.

---

[1]For the tax year 1976-1977 the Assessor had determined the building's full cash value at $16.9 million using the same method of valuation. According to the Assessor, the building had increased in value more than $4 million in one year.

[2]All statutory references are to the Revenue and Taxation Code.

On September 14, 1977, Pacific filed an application for reduction, seeking equalization with respect to the subject property. The Assessment Appeals Board (the Board) conducted an equalization hearing. Pacific was denied all relief, except the Board stipulated Pacific's Wang computer had been improperly classified and was, in fact, personal property. Thereafter, Pacific filed an application for refund, pursuant to section 5096 et seq., with the Orange County Board of Supervisors and the City Council of the City of Newport Beach. When that application was also denied, Pacific commenced this action for refund of taxes.

The trial court determined the Assessor employed the wrong method of valuating the building. The court also determined that Pacific's application for equalization was sufficient to bring into question the legality of the escape assessments levied for tax years 1973-1974, through and including 1976-1977, and that the Board had erroneously determined it had no jurisdiction to consider the equalization and adjustment requested as to those escape assessments. In addition, the court determined Pacific was entitled to a refund of taxes paid on computer equipment for tax years 1973-1974 through 1976-1977.[3] The trial court ordered a refund of taxes erroneously collected from Pacific for tax years 1973-1974 through 1976-1977 and remanded Pacific's application for equalization to the Board for a redetermination of the fair market value of the subject building.

In its original valuation of the subject property, the Assessor used the "reproduction cost" method of valuation. The Board agreed with the Assessor's valuation of the subject property. In its findings of fact, the Board stated as follows: "The reproduction cost approach to value (i.e., the approach relied upon by the Assessor) is the proper method of valuing the subject building because reliable comparable sales and income data are lacking. . . . [T]his building possesses unique characteristics and because of its unique, prestige [sic], monument-type characteristics, the sales and income data presented by Petitioner of non-unique, non-monument-type properties are not comparable and are unreliable. . . . Said building was specifically designed as the owner-occupied, corporate headquarters of the Petitioner [Pacific], and possess [sic] many unique characteristics . . . which were specifically designed to meet the needs of the Petitioner. [¶] The subject building is being put to its highest and best use as the Petitioner's corporate headquarters. [¶] The Board has found that the full cash values of the land and building as determined by the Assessor (i.e., $3,046,000 and $21,067,000 respectively) should be sustained."

---

[3]On this appeal the County does not contest the trial court's determination regarding taxation of Pacific's computer equipment.

The trial court disagreed with the Board as to the proper method of valuating the subject property. In its statement of decision the trial court concluded, among other things, "[t]he highest and best use of the Building is as an office facility," and Pacific's use of the building as a corporate headquarters "is not qualitatively or quantitatively different than the use to which any other potential commercial user" might put it. The court noted that in determining the fair market value of property the appraiser must look to the exchange value of the property in the market generally and not to a particular owner. The court found the market for Pacific's building is a "nationwide market" and on a nationwide basis buildings used as corporate headquarters are "typically purchased in anticipation of a money income." The trial court stated the "income approach to value is the method generally used by experienced appraisers in the marketplace" for determining the fair market value of property similar to the subject property. The court also concluded the building "can be attributed a hypothetical income stream by comparison with rents derived from other office buildings in Newport Center and Newport Beach generally." It also found the building suffers from "considerable functional obsolescence" and represents a substantial over-improvement. For these reasons, among others, the trial court concluded the Assessor "erroneously applied the reproduction cost approach to value in attempting to determine the fair market value of the Building for the 1977-78 tax year . . . ."

In its judgment, the trial court ordered the Board to redetermine the fair market value of the property giving "*substantially* more weight to the income approach to value, which is the preferred approach to value, than to the cost approach to value. . . ."

### VALUATION OF THE PROPERTY

On this appeal, the County contends the trial court erred in failing to adopt the Board's determination that the reproduction cost approach to value was properly applied by the Assessor to determine the fair market value of the property.

California Constitution, article XIII, section 1 provides in part, "All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value." The term "full value" is defined as "fair market value, full cash value, or such

other value standard as is prescribed by the Constitution or in this code under the authorization of the Constitution." (§ 110.5.)

The parties agree the value standard applicable here is fair market value. ■ "Fair market value" is defined as: ". . . the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (§ 110; *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 561-562 [290 P.2d 544]; *Xerox Corp.* v. *County of Orange* (1977) 66 Cal.App.3d 746, 752 [136 Cal.Rptr. 583].)

Property assessors have developed three basic methods for determining fair market value. They are: (1) the market data method, or comparable sale method; (2) the income capitalization method; and (3) the cost replacement, or reproduction cost method. (See *Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 24 [127 Cal.Rptr. 154, 544 P.2d 1354]; State Board of Equalization, Assessors' Handbook—General Appraisal Manual (2d ed. 1962) pp. 45-58, 60-91, 93-101.)

■ "In reviewing an assessment, a challenge to the result reached by an assessor after applying a sound valuation method is to be distinguished from a challenge to the validity of the method itself." (*ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 252 [162 Cal.Rptr. 186].) Where the challenge is to the result reached by the assessor after applying an admittedly proper method of valuation, the trial court sits as an appellate court and applies the substantial evidence test to decide whether the Board's determination is proper. Where, however, the challenge is directed at the method, i.e., the technique used in valuating the property, a legal issue is presented upon which the trial court is empowered to take additional evidence. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 23; *Jones* v. *County of Los Angeles* (1981) 114 Cal.App.3d 999, 1004 [170 Cal.Rptr. 879]; *Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 178 [116 Cal.Rptr. 160]; *Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 474 [112 Cal.Rptr. 327].)

■ In the case before us, the trial court took additional evidence on the question of the legality of the method of valuation applied by the Assessor. Based on the entire record, including the evidence taken at trial, we have determined the trial court did not err in holding the Assessor applied

an improper method for determining the fair market value of the building for the 1977-1978 tax year.

The County, claiming the issue is one of fact, contends the trial court could not come to a conclusion on the building's highest and best use different from that reached by the Board. However, the trial court did not make a different factual determination. The highest and best use of property is merely a factor in determining market value. (*City of Daly City* v. *Smith* (1952) 110 Cal.App.2d 524, 531 [243 P.2d 46].) The County and the Board took the position the subject building was so unique that it was not an ordinary office building. They argued it was a monument or figurehead representing Pacific, and, in this function, it attained its highest and best use. The trial court correctly determined this characterization of the building arose from a basic error of law. The Assessor and the Board looked only to the particular use of the building by Pacific. They erroneously failed to consider the value of the property "in view of all the purposes to which it is naturally adapted." (*Sacramento etc. R.R. Co.* v. *Heilbron* (1909) 156 Cal. 408, 412 [104 P. 979]; see *People* ex rel. *State Park Com.* v. *Johnson* (1962) 203 Cal.App.2d 712, 716-717 [22 Cal.Rptr. 149].)

■ The value of the building in the marketplace is its value to potential purchasers generally, and the normal uses to which potential purchasers could put it must be considered. As the court in *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, stated at page 566: "In valuing [*sic*] property, the assessor must adhere to the statutory standard of 'full cash value,' and must therefore estimate the price the property would bring on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. The net earnings to be capitalized, therefore, are not those of the present owner of the property, but those that would be anticipated by a prospective purchaser."

■ In characterizing the subject building as unique and as a monument, the Assessor and the Board justified their use of the cost replacement method of valuation by concluding that reliable income and sales data were not available.[4] Income data was in fact readily available from the various office

---

[4]Title 18, California Administrative Code, section 6, covers the reproduction and replacement cost approaches to value. Subdivision (a) of that section provides, "The reproduction or replacement cost approach to value is used in conjunction with other value approaches and *is preferred when neither reliable sales data . . . nor reliable income data are available* and when the income from the property is not so regulated as to make such cost irrelevant. *It is particularly appropriate* for construction work in progress and for other *property that has experienced relatively little physical deterioration, is not misplaced, is neither over-nor underimproved, and is not affected by other forms of depreciation or obsolescence.*" Title 18, California Administrative Code, section 8, covers the income approach to value, and subdivision (a) of that section provides: "The income approach to value is used in conjunction

buildings located in Newport Center and in Newport Beach generally. However, in stressing the particular use to which Pacific put the subject building, the Assessor claimed such data was not relevant. In this, the Assessor and the Board erred. Using a method of valuation designed solely to capture the specific utility of property to a particular owner is contrary to law. The best and highest use of the subject building in the marketplace was as an office facility, as the trial court correctly concluded.

## ESCAPE ASSESSMENTS

As noted previously, on June 20, 1977, as the result of an audit, the Assessor levied escape assessments on the subject property for the 1973-1974 through 1976-1977 tax years.[5] A tax of $25,551.38 was imposed as a result of the escape assessment. On September 14, 1977, Pacific filed its application for equalization of 1977 assessment on a printed form provided by the Board.

At the hearing on March 21, 1978 the Assessor took the position Pacific's application did not put into issue the validity of the escape assessments. This was so, according to the Assessor, because item No. 5 of the application did not identify the "unsecured bill number" for the escape assessments and only identified the number of the parcel for which equalization was sought.[6] The Board, relying upon sections 1603, 1605 and Property Tax Rule 305 (Cal.Admin. Code, tit. 18, § 305), determined it lacked jurisdiction to hear the matter of the escape assessments because they were not properly designated in the petition for equalization filed by Pacific.

A careful review of the record in light of the above noted sections and rule convinces us that Pacific's application was sufficient to put the escape assessments before the Board. (See *Midstate Theatres, Inc.* v. *Board of Supervisors* (1975) 46 Cal.App.3d 204, 208-211 [119 Cal.Rptr. 894].)

---

with other approaches when the property under appraisal is typically purchased in anticipation of a money income and either has an established income stream or can be attributed a real or hypothetical income stream by comparison with other properties. It is the preferred approach for the appraisal of land when reliable sales data for comparable properties are not available. It is the preferred approach for the appraisal of improved real properties and personal properties when reliable sales data are not available and the cost approaches are unreliable because the reproducible property has suffered considerable physical depreciation, functional obsolescence or economical obsolescence, is a substantial over- or underimprovement, is misplaced, or is subject to legal restrictions on income that are unrelated to cost."

[5]County's witness testified the definition of an escape assessment "is an assessment added to the roll to account for property which had apparently failed to have been enrolled earlier or originally."

[6]Item No. 5 on the application is as follows: "(5) ASSESSOR'S PARCEL NUMBER (or Unsecured Bill Number): 442-018-02."

A more difficult question raised by the County on this appeal is whether the application was timely filed with respect to the escape assessments.[7] Subdivision (d) of rule 305 (Cal. Admin. Code, tit. 18, § 305) provides as follows: "Time of filing. The application [if it pertains to an assessment made within the regular assessment period] shall be filed with the clerk beginning July 2 but no later than September 15. An application will be deemed to have been timely filed if it is sent by U.S. mail, properly addressed with postage prepaid and is postmarked on September 15 or earlier within such period. [¶] An application for a change of assessment *made outside the regular assessment period* must be filed with the clerk no later than 60 days after the date on which the assessee was notified of the assessment pursuant to Section 1605 of the Revenue and Taxation Code. Except as provided in Revenue and Taxation Code sections 619.2, 620 and 620.5, the board has no jurisdiction to hear an application unless filed within the time specified. The regular assessment period is from March 1 to and including July 1 or to such later date for completion of the roll as·may be authorized by the State Board of Equalization." (See §§ 1603, 1604, 1605.)

■ Under this rule, the taxpayer has until September 15 of the year of assessment to file an application for equalization with respect to an assessment made within the regular assessment period. However, if an assessment is made outside the regular assessment period, the taxpayer only has 60 days within which to file an application for equalization. Here we must determine whether the escape assessments were made "outside the regular assessment period." Rule 305 provides the regular assessment period is from March 1 to and including July 1. The escape assessments were made on June 20, 1977, but they covered tax years 1973-1974, through and including 1976-1977. The County takes the position the assessments were made outside the regular assessment period because they pertained to years other than 1977-1978. As an example, they contend the regular assessment period for an assessment as to 1973-1974 is March 1–July 1 of 1973. On the other hand, Pacific contends any assessment levied during the calendar period March 1–July 1, regardless of the tax year involved, is an assessment made *within* that regular assessment period.

There is no language in either rule 305 or sections 1603 and 1605 limiting the term "regular assessment period" with respect to any specific tax year. It appears more likely that there is a four-month period in every calendar year in which tax assessments are levied in the normal course of events, and as to an assessment made during that period, regardless of the tax year involved, a taxpayer would have until September 15 to file an application

---

[7]This issue does not appear to have been raised before the Board, but was raised in the trial court.

for reduction of assessment. The trial court found the escape assessments were levied during tax year 1977-1978 and were made within the regular assessment period for tax year 1977-1978.

Even if this were not so, in this case there is no evidence Pacific did not file its application within 60 days of receipt of notice of the tax bill or other notice of the assessment. Section 1605, subdivisions (a) and (b) provide: "(a) *An assessment made outside of the regular assessment period is not effective for any purpose,* including its review, equalization and adjustment by the county board, *until the assessee has been notified thereof* personally or by United States mail at his address . . . . Receipt by the assessee of a tax bill based on said assessment shall suffice as such notice. [¶] (b) Upon application for reduction . . ., such assessment shall be subject to review, equalization and adjustment by the county board. *The application must be filed* with the clerk *no later than 60 days after the date on which the assessee was notified.*" (Italics added.) Here the evidence showed the assessment was made on June 20, 1977. There was testimony from the Orange County tax collector's office that it was their policy to get tax bills out within five days of the assessment date, and that the bills were sent to "a vendor for stuffing and depositing in the mail." There was no evidence indicating when Pacific received the tax bill or that they were otherwise notified of the assessment. The form application for equalization of 1977 assessment provided by the Board stated thereon in italicized print "THIS APPLICATION MUST BE FILED ON OR BEFORE SEPTEMBER 15, 1977." Pacific filed its application for reduction on September 14, 1977. Presenting no evidence as to when Pacific received notice of the assessment, the County failed to sustain its burden of proof on the issue of whether the application was timely filed.

The judgment is affirmed.

Crosby, J., and Wallin, J., concurred.