[No. G012151. Fourth Dist., Div. Three. Jan. 28, 1993.]

COUNTY OF ORANGE, Plaintiff and Appellant, v.
ORANGE COUNTY ASSESSMENT APPEALS BOARD NO. 1,
Defendant and Respondent;
AMERICAN TELEVISION AND COMMUNICATIONS
CORPORATION, Real Party in Interest and Respondent.

**COUNSEL**

Terry C. Andrus, County Counsel, and Thomas C. Agin, Deputy County Counsel, for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Shartsis, Friese & Ginsburg, Douglas Mo and Paul M. Gordon for Real Party in Interest and Respondent.

**OPINION**

**WALLIN, J.**—The County of Orange (County) appeals the judgment denying its petition for writ of mandamus seeking to set aside a decision of the

Orange County Assessment Appeals Board No. 1 (Board), which adopted the position of taxpayer American Television and Communications Corporation (American) concerning the property tax on American's cable television system. The County contends the Board erred as a matter of law by: (1) failing to consider the appropriate appraisal unit as a whole for valuation purposes; and (2) rejecting the comparable sales and income approaches in establishing the property's value. We affirm.

The Board heard several days of testimony and made certain findings. The trial court relied on that testimony in ruling on the petition for writ of mandamus. We summarize the Board's findings:

American owns and operates a cable television system which provides services for a fee to subscribers in the City of Orange and an abutting unincorporated area. To do so, it obtained requisite licenses, permits and approval to operate in that geographical area. It receives television signals and transmits them to the subscribers through a network of trunk and feeder cables, some of which are above and some of which are below ground.

American owns and uses taxable tangible property to carry on its business, including real property, distribution cables, buildings, cables, tower and antennas, local origination television equipment, furniture and fixtures, converters, and surplus and test equipment. American owned some of its taxable tangible property when it began operations in 1980 and acquired more later.

As part of the approval process, American entered into a franchise agreement with the City and County of Orange which included the right to use public property for its cable distribution network. That right constitutes a taxable possessory interest in public property. (Rev. & Tax. Code, § 107.7.)

For the lien dates in 1987, 1988, and 1989, the assessor calculated the full cash value of American's property at $30 million, $35 million, and $38 million, respectively,[1] and American challenged those values before the Board. To obtain the values the assessor used a "unitary approach," determining all of American's property should be valued as a single appraisal unit, applying a valuation approach, and allocating the total value among the various component parts of the appraisal unit.

To support his use of the "unitary approach," the assessor presented evidence of two other methods. First, he presented a comparable sales approach, which involved taking purchase prices for other cable television

---

[1]Although the assessor determined those values, the amounts actually enrolled were considerably less due to the constraints of the California Constitution, article XIII A, popularly known as Proposition 13. The enrolled amounts were approximately $16 million, $18 million, and $19 million respectively.

systems in Southern California, determining the price per subscriber, and multiplying that figure by the number of American's subscribers. The Board found that approach unreliable because it included the value of nontaxable intangible assets such as existing franchises or licenses to construct, a subscriber base, marketing and programming contracts, management and operating systems, an in-place work force, going concern value, and good-will.

The assessor also presented the income approach, which involved multiplying American's net income by a capitalization rate. The Board rejected this approach for the same reason it rejected the comparable sales approach, it did not factor out the value of nontaxable intangible assets. The assessor did not present evidence as to how the property would be valued using a third accepted method of valuation, the replacement cost approach.

The Board accepted the testimony of American's three expert appraisers who identified American's taxable tangible property and opined as to its value. For all items except American's possessory interest, the property was divided into three categories: land and land improvements, fixtures, and personal property.[2]

As to the fixtures and personal property, the Board considered all three methods of valuation and determined the replacement cost approach was the most reliable. It would not include nontaxable intangible value, and it best equalized assessments since the assessor had traditionally used that approach in valuing fixtures and personal property of similar businesses. The Board used the testimony and data from American's witnesses to calculate the appropriate replacement cost for these items.[3] It calculated the value for the undergrounding, which was categorized as land and land improvements, by taking its cost and assigning it an infinite life with no trending for the years in question.[4]

For the possessory interest in public property, the Board used the income capitalization method, which is presumptively correct under Revenue and Taxation Code section 107.7. It found American's franchise fees were the market rent which paid for the possessory interest and capitalized them at a

[2]The land and land improvements were comprised of the leasehold improvements and the undergrounding (the joint trench and back build); the fixtures were comprised of the cable distribution plant (except for the undergrounding), headend, tower, antenna, and earth station; and the personal property was comprised of the office furniture, computers, tools, cablecasting equipment, radios and test equipment, electronic ad equipment, converters, and supplies.
[3]These items totaled $6,695,366 in 1987, $6,404,988 in 1988, and $6,172,436 in 1989.
[4]The values were $2,401,080 for 1987, $2,671,931 for 1988, and $2,805,000 for 1989.

10 percent rate, yielding a $5 million value for each of the three years in question. The Board determined that American's total value for the years in question was greater than that enrolled, due to the effect of Proposition 13, and that the enrolled value should remain unchanged.[5] The assessor was ordered to change the assessed values for the years in question to those found by the Board.

## I

The County argues the Board erred as a matter of law by failing to consider all of American's property as one appraisal unit for valuation purposes. In other words, the County claims the Board should not have separated the property into land and land improvements, fixtures, and personal property in determining the value of American's property. We conclude the Board acted properly, but first we must consider the applicable standard of review.

American asserts the Board's determination, and that of the trial court, must be upheld if substantial evidence supports the decision. *Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14 [127 Cal.Rptr. 154, 544 P.2d 1354], set out the proper standard. "If the [petitioner] claims only that the [board] erroneously applied a valid method of determining full cash value, the decision of the board is equivalent to the determination of a trial court, and the trial court in turn may review only the record presented to the board. [Citations.] The trial court may overturn the board's decision only when no substantial evidence supports it, in which case the actions of the board are deemed so arbitrary as to constitute a deprivation of property without due process. [Citations.] On the other hand, when the [petitioner] challenges the validity of the valuation method itself, the trial judge is faced with a question of law. [Citations.] That question . . . is whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." (*Id.* at p. 23; see also *County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1450 [262 Cal.Rptr. 439].)

The County's attack is directed at the Board's method of valuation, so we and the trial court look to see whether, as a matter of law, the method was arbitrary, in excess of discretion, or in violation of the standards prescribed by law. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco*,

---

[5]The totals were $14,096,446 in 1987, $14,076,919 in 1988, and $13,977,436 in 1989. These amounts are less than amounts actually enrolled. At oral argument the County conceded the Board's ruling would actually lower the enrolled amounts to these levels.

*supra,* 16 Cal.3d at p. 23.)[6] In this regard we look not to whether another approach might also have been valid or yielded a more precise reflection of the property's value, but whether the method chosen was contrary to law. (*Trailer Train Co.* v. *State Bd. of Equalization, supra,* 180 Cal.App.3d at p. 585 [selection of a particular method of valuation from among valid methods rests in the board's discretion]; see also, *Union Pacific Railroad Co.* v. *State Bd. of Equalization* (1991) 231 Cal.App.3d 983, 992 [282 Cal.Rptr. 745] [inappropriate application of an otherwise valid valuation method could be considered a factual question].) "The law requires only that an assessor adopt and use a reasonable method—neither a trial court, nor this court, can reject a method found by the board to be reasonable merely because, in [its] nonexpert opinion, another method might have been better." (*Texaco, Inc.* v. *County of Los Angeles* (1982) 136 Cal.App.3d 60, 63 [186 Cal.Rptr. 16], fn. omitted.)

■■■ Relying on Revenue and Taxation Code section 51, subdivision (e), the County says the Board erred as a matter of law by failing to value American as one unit, "the whole system itself." That subdivision is of no avail. It states, "For purposes of subdivisions (a) and (b), 'real property' means that appraisal unit which persons in the marketplace commonly buy and sell as a unit, or which are normally valued separately."

Subdivisions (a) and (b) of Revenue and Taxation Code section 51, deal with the determination of a property's value as the lesser of its full cash value and its base year value (1975) enhanced by an inflation factor. Those subdivisions say nothing about the propriety of dividing the appraisal unit into components to determine its value. Further, subdivision (e) states, albeit ungrammatically, that an "appraisal unit" can be that "which are [*sic*] normally valued separately." Taken as a whole, neither section 51 in general, or subdivision (e) in particular, mandates appraisal of the property as a single unit.

Rule 22(b) of the Orange County Assessment Appeals Board and Assessment Hearing Officer Rules is similarly of no avail. That rule provides that

---

[6]We reach this conclusion recognizing there is often a fine line between a challenge to an application of a valuation method and a challenge to the method itself. (*Trailer Train Co.* v. *State Bd. of Equalization* (1986) 180 Cal.App.3d 565, 582 [225 Cal.Rptr. 717]; see also *People* v. *Louis* (1986) 42 Cal.3d 969, 984-988 [232 Cal.Rptr. 110, 728 P.2d 180] [discussing mixed questions of law and fact].) Here, the Board opted to value American's property in separate subunits and to apply the cost method of valuation, after determining the assessor's approach to valuation improperly captured intangible asset value. That determination involved at least a mixed question of law and fact and, based upon the Board's expertise, should be adopted by the courts in reviewing the propriety of the method selected. (See *Shell Western E & P, Inc.* v. *County of Lake* (1990) 224 Cal.App.3d 974, 979 [272 Cal.Rptr. 313] [assessment appeals boards have special expertise in property valuation and their factual determinations are entitled to deference].)

in considering a reduction in assessed value, the Board must "make a determination of the full value of the whole property." Nothing in the rule says how the Board must make that determination, let alone that it may not value components separately. It does provide the Board may "adjust the value of the parts," a task seemingly impossible unless the parts have been separately valued. And, contrary to the County's assertion that "the most appropriate unit for valuation is the whole system itself," the testimony before the Board established that the cable distribution plant of cable television companies is valued separately, usually using the cost approach.

Further support exists for the concept that the components of taxable property may be separated for valuation purposes. Revenue and Taxation Code section 107.7 deals with valuation of cable television possessory interests and provides the preferred method of valuing that portion of a cable television company's property shall be capitalizing the annual rent. (Rev. & Tax. Code, § 107.7, subd. (b)(1).) It says nothing about changing the preferable methods for valuing other types of taxable property. (Cal. Code Regs., tit. 18, §§ 4, 6 & 8 [stating the preferred methods under other circumstances].) To apply the preferred methods both to the possessory interest and to other aspects of the property when the preferred methods differed would require separating the two facets of the property for valuation purposes, as was done here.[7]

Title 18, section 461, subdivision (d) of the California Code of Regulations states that where there are declines in value (here, the fixture portion of the cable distribution plant), "Land and improvements constitute an appraisal unit . . . [and] fixtures and other machinery and equipment classified as

---

[7]The Legislature's observation in enacting Revenue and Taxation Code section 107.7 that "[p]ossessory interests of cable television systems do not sell by themselves" does not alter the analysis. (Stats. 1988, ch. 1630, § 1, subd. (d), p. 5939.) The section codified the holding in *Cox Cable San Diego, Inc.* v. *County of San Diego* (1986) 185 Cal.App.3d 368 [229 Cal.Rptr. 839] that possessory interests of cable television companies constitute taxable property. (*County of Stanislaus* v. *Assessment Appeals Bd.*, *supra*, 213 Cal.App.3d at p. 1452, fn. 3.) The Legislature's observation in the enabling legislation merely justifies use of the income capitalization method so the value of such property can be captured and assessed. (See *id.* at p. 1455.)

The County reasoned at oral argument that because the possessory interest is worth nothing without cable in place along the right-of-way, the value of the cable was wedded to the possessory interest and should not have been valued separately. But the preferred method of capitalizing that portion of the franchise fee attributable to the possessory interest takes the County's reasoning into account. A cable television company would not "rent" the right-of-way unless it intended to use it. Thus, capitalizing that portion of the franchise fee reflects the value to the cable company of having the right-of-way with cable in place.

improvements constitute a separate appraisal unit." The rule contemplates a division in the appraisal unit for valuation purposes.[8]

Other sources rebut the County's claim that a taxpayer's property cannot be separated for valuation purposes. Title 18, section 3 of the California Code of Regulations provides that an assessor "shall consider one *or more*" of the three acceptable valuation approaches. (Italics added.) Similarly, title 18, section 324 provides the board "shall determine whether the method*(s)* used was *(were)* properly applied," and "[t]he findings shall also include a statement of the method *or methods* of valuation used . . . ." (Cal. Code Regs., tit. 18, § 324, subds. (a) & (e), italics added.) One way to use multiple methods would be when value is best calculated by breaking down the property into component parts.

To summarize, applicable law suggests there is no wrong in rationally dividing property into component parts for valuation purposes. (Compare *McDonnell Douglas Corp.* v. *County of Los Angeles* (1990) 219 Cal.App.3d 715, 726 [268 Cal.Rptr. 294] [separate *parcels* were properly valued as economic unit; the assessor was not required to value each parcel subject to its individual restrictions].) The County has provided no authority to the contrary. The Board was within its discretion to separate the property as it did.

II

■    The County urges the Board erred as a matter of law by rejecting the comparable sales and income approaches in establishing the property's value. Using the same review standards discussed above, we conclude it did not.

The three basic methods of valuation are the reproduction cost or cost replacement method, the market data or comparable sales method, and the income capitalization method. (*Pacific Mutual Life Ins. Co.* v. *County of Orange* (1985) 187 Cal.App.3d 1141, 1147 [232 Cal.Rptr. 233].) The selection of a particular method of valuation from among the valid methods rests in the Board's discretion. (*Trailer Train Co.* v. *State Bd. of Equalization, supra*, 180 Cal.App.3d at p. 585.) It is constrained only by fairness and uniformity. (*ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 252 [162 Cal.Rptr. 186].)

---

[8]By engaging in this reasoning, we do not hold fixtures must always be valued apart from the land and land improvements. We merely provide an example which helps refute the County's assertion that the converse is true.

Here, the Board determined the income capitalization method using the annual franchise rent was appropriate for American's possessory interest. It was the preferred method (Rev. & Tax. Code, § 107.7, subd. (b)(1)), and the County does not contend it was improper.

The County does attack the Board's use of the cost replacement approach to value the remainder of the property, contending we held in *Pacific Mutual Life Ins. Co. v. County of Orange, supra,* 187 Cal.App.3d 1141 that the income capitalization approach was "a preferred method for valuing all income producing real property . . . ." Not so. All we held there was that the cost reproduction approach was not appropriate where it was "designed solely to capture the specific utility of property to a particular owner . . . ." (*Id.* at p. 1149.)

Several cases have upheld the validity of the cost replacement approach for tangible taxable property. (*Bret Harte Inn, Inc. v. City and County of San Francisco, supra,* 16 Cal.3d at pp. 21-23, 25 [cost approach is not inherently arbitrary although it was in that instance]; *May Department Stores Co. v. County of Los Angeles* (1987) 196 Cal.App.3d 755, 769-772 [242 Cal.Rptr. 162]; *Xerox Corp. v. Orange* (1977) 66 Cal.App.3d 746, 753 [136 Cal.Rptr. 583]; *Midstate Theatres, Inc. v. County of Stanislaus* (1976) 55 Cal.App.3d 864, 882 [128 Cal.Rptr. 54]; *Guild Wineries & Distilleries v. County of Fresno* (1975) 51 Cal.App.3d 182, 188-189 [124 Cal.Rptr. 96] [single open market sale does not bar use of replacement cost approach]; *Western Title Guaranty Co. v. County of Stanislaus* (1974) 41 Cal.App.3d 733, 739-741 [116 Cal.Rptr. 351].) The County argues the other two methods were preferable. The comparable sales method is preferable "when reliable market data are available." (Cal. Code Regs., tit. 18, § 4.) The income method is preferable "when reliable sales data are not available and the cost approaches are unreliable." (Cal. Code Regs., tit. 18, § 8, subd. (a).)

Here, the Board found that neither the comparable sales approach nor the income approach was reliable and that the cost method was. When that is so, the cost method becomes preferable. (Cal. Code Regs., tit. 18, § 6, subd. (a).)

The County seems to reason that because the cost approach yielded a lower value than the other two approaches, it did not yield an assessment at full value as required by law. (Rev. & Tax. Code, § 110.) But the Board correctly reasoned why the values differed. The assessor's method captured intangibles which are not subject to taxation such as existing franchises or licenses to construct, a subscriber base, marketing and programming contracts, management and operating systems, an in-place work force, going concern value, and goodwill.

The assessor and board *may* apply a method of assessment which reflects the value enhancement of tangible taxable property due to the presence of intangible property. (*County of Stanislaus* v. *Assessment Appeals Bd.*, *supra*, 213 Cal.App.3d at pp. 1454-1455.) The Board did so here when it applied the income capitalization method prescribed by Revenue and Taxation Code section 107.7 to value the possessory interest. (*Ibid.*) Any additional value must have been attributable to intangibles which enhanced the value of the *business*, not the *property*, e.g., in-place work force, going concern value, and goodwill.[9]

The Board's choice of the cost replacement method for fixtures and personal property was not arbitrary, an abuse of discretion, or contrary to law. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco*, *supra*, 16 Cal.3d at p. 23.) The Board considered all three methods and selected the cost replacement method because it best expressed the value of American's property and was necessary to achieve fairness and uniformity by equalizing assessments. (*ITT World Communications, Inc.* v. *County of Santa Clara*, *supra*, 101 Cal.App.3d at p. 252.)

The judgment is affirmed.

Moore, Acting P. J., and Sonenshine, J., concurred.

---

[9]At oral argument, the County conceded there would be a problem if the assessor had enrolled the entire $38 million value he had calculated because it might have included impermissible *business* value intangibles such as goodwill. The County asserted this potential problem was avoided because the assessor only enrolled a value of $19 million, and reasoned that figure eliminated any business value intangibles.

But the $19 million figure was arrived at by taking the 1975 base value pursuant to Proposition 13 and adding new property acquisitions and the permissible inflation enhancement. It did not purport to have anything to do with scientifically eliminating business value intangibles from the total *property* value. Conversely, American presented expert testimony, which the Board accepted, affirmatively showing the value of the property apart from business value intangibles. Thus, the Board only had one analytically and procedurally proper valuation before it. The County admitted as much in oral argument when it reasoned that if the assessor erred, it was in assuming (as opposed to proving) that the $19 million reduction in the enrolled value accounted for all business value intangibles.