[No. D015654. Fourth Dist., Div. One. May 12, 1993.]

SERVICE AMERICA CORPORATION, Plaintiff and Respondent, v. COUNTY OF SAN DIEGO et al. Defendants and Appellants.

**COUNSEL**

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Lewis P. Zollinger, Deputy County Counsel, for Defendants and Appellants.

Endeman, Lincoln, Turek & Heater, Ronald L. Endeman and Henry E. Heater for Plaintiff and Respondent.

**OPINION**

**FROEHLICH, J.**—The subject of this case is the proper method to be used in valuing, for property tax purposes, a possessory interest held by a franchisee selling food and beverages at San Diego's Jack Murphy Stadium. The interest was reassessed in 1983 because of an amendment to the existing concession agreement between the City of San Diego (City) and Service America Corporation (Service America). Service America sought revision of the 1983, 1984 and 1985 assessments before the Assessment Appeals Board (Board). The Board held hearings in March 1986 and confirmed the assessor's valuations. Service America then paid the taxes under protest and brought an action in superior court for a refund.[1]

The superior court ruled that the appraisal methodology utilized by the appraiser was incorrect and the resulting assessed value of Service America's possessory interest was excessive. With commendable deference to the administrative board, the judge admitted he was "not prepared to declare the correct methodology," but issued a writ of mandamus to the Board requiring it to "set aside its decision . . . to reconsider its action . . . and to take any further action specially enjoined on it by law." The County of San Diego (County) appeals this ruling.

### PRELIMINARY MATTERS

We first review preliminary considerations which are not in dispute or are at least we think well settled, but which require our brief recitation before approaching the central issue of this case.

---

[1]The procedure for seeking refund of taxes paid under protest by an action in superior court is set forth in 9 Witkin, Summary of California Law (9th ed. 1989) Taxation, section 247, pages 301, 302 (hereafter 9 Witkin).

Property subject to taxation is assessed at its "full value." (Rev. & Tax. Code, § 401.) ▉ Property owned by governmental entities is generally exempt from taxation. (9 Witkin, *supra*, §§ 144, 145, pp. 178, 179.) Where the governmental property is leased to or otherwise devoted to use by a private entity, however, the private interest so created is subject to tax, and is separately assessed as a "possessory interest." (*Id.* at § 138, pp. 172, 173.) Considerable controversy has been generated over recent years as to the exact nature of the interest which will permit classification as a taxable possessory interest (see, e.g., our recent decision in *United Air Lines, Inc.* v. *County of San Diego* (1991) 1 Cal.App.4th 418 [2 Cal.Rptr.2d 212], in which a divided court discussed whether landing rights at an airfield could be classified as a taxable possessory·interest). There is no dispute in this case, however, as to the existence of a possessory interest held by Service America. The concession agreement gave Service America the right of occupancy of certain booths and other space in the stadium, stipulated to constitute some 67,000 square feet of space, and all parties agree that this property right is a possessory interest subject to valuation and taxation by the County. The disagreement relates solely to the method of appraisal used and the assessed value derived therefrom.

The proper scope of review of assessment decisions—both review by the superior court of Board actions and review by our court of superior court decisions—is well established. (See *Bret Harte Inn, Inc.*v. *City and County of San Francisco* (1976) 16 Cal.3d 14 [127 Cal.Rptr. 154, 544 P.2d 1354]; *ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246 [162 Cal.Rptr. 186]; and also a very recent case, *County of Orange* v. *Orange County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 524, 529 [16 Cal.Rptr.2d 695].) ▉ When the assessor utilizes an approved valuation method, his factual findings and determinations of value based upon the appropriate assessment method are presumed to be correct and will be sustained if supported by substantial evidence. If the underlying valuation methodology is challenged, however, the issue becomes a question of law subject to de novo review both by the superior court and on appeal. (*ITT World Communications, supra*, at pp. 252, 253.) As will be discussed in detail hereafter, we deal here not with disputed questions of fact. The gross and net earnings of Service America are not in dispute; the space occupied by it in the stadium is agreed; the nature of its business and operations is unquestioned. The issue is whether the assessor erred by including in his valuation of assets the value of Service America's going business, sometimes called its "enterprise value." We identify this issue as one of law; hence we confirm that the trial court was bound to apply its independent judgment to the issue, and we in like fashion accord complete review.

## FACTS

The contract between the City and Service America which created the taxable interest in real property is called "Agreement for Concession, Restaurant and Catering Services." The agreement contains language of a lease only when it refers to the use of office space by Service America. The right to operate a food and beverage concession is phrased in terms of a grant of an "exclusive right, license and privilege." Service America was given the right to occupy certain areas, such as "vendor areas" and the "Plaza Level Restaurant" on a basis which apparently is exclusive. It was also given the right to sell its products "[i]n all aisles and passageways adjacent to the spectators' seats" and further to sell in the stadium parking lot (upon terms to be later agreed to). The fees to be paid for these concessions were 30 percent of gross restaurant sales of beer, 10 percent of gross sales of tobacco, candy and specialty items, 20 percent of gross restaurant sales of alcoholic beverages other than beer, and a graduated scale of from 3 percent to 10 percent of other gross restaurant sales.

■ The method of appraisal used by the assessor was the "income capitalization method."[2] The starting point in this analysis was the actual income derived by Service America in the years 1983, 1984, and 1985, from which the assessor estimated expected future gross sales: a figure of $13,750,000 annually. The assessor next calculated the concession fees which would be paid by Service America, based upon a prior experience of an average fee of 28 percent of gross sales. An annual future concession fee was estimated to be $3.9 million. The assessor concluded that a portion of the fees paid by Service America should be deemed related to reimbursement of the City for the stadium's cost of operations, including administration, field maintenance, advertising and the like. These calculations, which included an allocation of costs to cotenants of the stadium, resulted in lowering the projected annual concession fee from $3.9 million to $2.7 million. The assessor then calculated the present value of a stream of income of $2.7 million to be received annually for the life of the concession agreement, using a discount factor of 13 percent. The ultimate calculation was an appraised value of Service America's possessory interest of $17.8 million. This assessed value when divided by the square feet of space exclusively allocated to Service America was $278 per square foot.

---

[2] Three methods for appraising real property for tax purposes exist: (1) the market data method (involving comparison of prices resulting in sales of comparable properties); (2) the income method (capitalization of the sum of future income attributable to the property adjusted for the risk of future nonreceipt of income); and (3) the cost method (based upon the property's replacement cost less depreciation). (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 24.) The capitalization of income method is an appropriate method for valuing the possessory interest in a leasehold. (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 564 [290 P.2d 544].)

Service America took the position that the concession fee was not related to any logical calculation of fair rental value for the premises occupied by Service America. Service America therefore started with another calculation: the percentage rent payable by comparable food and beverage vendors in situations in which the compensation was clearly rent, rather than part rent and part concession fee. This percentage Service America contended ranged from 6 percent to 10 percent of gross sales. Using the same gross sales figure as used by the county assessor, Service America then arrived at fair market rent for the premises of $962,500. The calculation of present value of this annual rent (adjusted for various factors not important to our review) resulted in a value of $4,539,000—some 24½ percent of the county assessor's figure.

## Discussion

The issue we must resolve is not whether Service America's calculations can be approved, or even whether its methodology is acceptable, but whether the County's approach is valid. The County's method, as we have seen, is to calculate the income stream payable to the City (adjusted by an assumed allocation for specific stadium costs) and assume that this income stream represents rent for the possessory interest in real property. Service America argues this is improper because the gross fees paid by Service America for its concession include a substantial sum representing consideration for rights and interests other than those associated with the occupancy or use of property.

The dilemma faced by the assessor, the Board, the superior court, and indeed all parties involved in this matter, is that there is no accurate way of separating the portion of the concession fee related to the use of property from the portion of the fee based on other considerations. We have no findings of fact from either the Board or the court that make any attempt at separation. However, evidence adduced at the superior court trial and the argument of Service America, not challenged in terms of their factual bases by the County, do permit the recitation of certain acknowledged facts.

A first essential fact to accept is that the gross sales of Service America, upon which the concession fee is based, have very little relationship to the use or occupancy of property. The sales are directly related to the attendance by the public at events held at the stadium, primarily the games of the national baseball league (the Padres) and football league (the Chargers). Of the greatest importance in terms of gross sales will be the success of the seasons of either team, coupled with the advertising or public relations efforts of the teams' administrations.

A second factor of importance is that the profitability of Service America in terms of its gross sales results in major degree from the exclusive nature of its concession grant. Undisputed testimony at trial indicated that the prices chargeable to stadium patrons (who have no alternative source of food or drink and are prohibited from bringing their own to the stadium) are some 30 percent higher than would be chargeable under ordinary circumstances. One could conclude, therefore, that the basis for Service America's willingness to pay a high concession fee does not relate to its right to use property, but rather depends upon its purchase of an exclusive sales prerogative—clearly an intangible right or benefit.

A final factor of importance is the recognition that the gross income of Service America is derived not only from its use of property but from its performance of a service. Service America is a going business concern with (apparently) competent management, a large cadre of employees, and substantial experience and "goodwill" in the area of food service. The prices paid by its customers for its wares obviously bear a high relationship to the ability of Service America to please the customers by the quality of comestibles and the acceptability of personal service—factors which have little or no bearing upon the use or occupancy of property.

Bearing in mind the above factual verities of our situation, we must review the applicable law. The traditional starting point for this discussion is to distinguish between property rights, which are taxable, and intangible rights or benefits, which are not. As stated in *Kaiser Co.* v. *Reid* (1947) 30 Cal.2d 610, 619 [184 P.2d 879], rights in the nature of mere permits or licenses cannot support a property tax; to be distinguished from the right of exclusive possession of premises, classifiable as a lease, which would be taxable.

However, even though intangible rights such as franchises cannot be the subject of tax, it has been held that the value of a right to use property may be enhanced by a franchise or other intangible right which accompanies the occupancy rights. Thus, in *Roehm* v. *County of Orange* (1948) 32 Cal.2d 280 [196 P.2d 550], while a liquor license could not be taxed as such (as personal property), its value could be considered when determining the valuation of related realty. "[I]n determining the value of [taxable] property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property." (*Id.* at p. 285.) This language was cited and followed in *ITT World Communications, Inc.* v. *County of Santa Clara, supra,* 101 Cal.App.3d at page 254, where the court held that the plaintiff's utility franchise, although not taxable directly,

could result in an enhancement of the value of the utility's otherwise taxable property (a case not, however, involving a possessory interest calculation).

To be contrasted with this authority is a line of cases which require, in assessing value, separation of the intangible or "enterprise" value of a business from its value related to use or occupancy of property. The leading case is *County of Riverside* v. *Palm-Ramon Development Co.* (1965) 63 Cal.2d 534 [47 Cal.Rptr. 377, 407 P.2d 289]. At issue was the valuation of the possessory interest in long-term leases on Indian lands. The appraiser had valued the possessory interest not on the basis of actual income derived from the leases, but by using "imputed values" based upon comparable leases. In approving this approach the *County of Riverside* court, quoting from *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, stated:

" 'In valuing property wherein actual income is derived in large part from enterprise activity and cannot be ascribed entirely to the use of the property, an *imputed* income analysis may be both useful and appropriate . . . . [*De Luz, supra,* 45 Cal.2d at p. 572.] In instances in which future income cannot be estimated with reasonable accuracy or is not ascribable entirely to the property, prospective net monetary income is *imputed* in an amount equal to a minimum reasonable return on estimated market value.' [*De Luz, supra,* at p. 565.] [¶] Here it appears that the actual income will be derived largely from enterprise activity (development, subleasing, percentage renting for commercial or professional usage)." (*County of Riverside* v. *Palm-Ramon Development Co., supra,* 63 Cal.2d at p. 538, italics added by *County of Riverside.*)

This concept was restated in *California Portland Cement Co* v. *State Bd. of Equalization* (1967) 67 Cal.2d 578 [63 Cal.Rptr. 5, 432 P.2d 700], which dealt with an assessor's entitlement to corporate records which would disclose profitability. While holding that profitability of the operation was a relevant factor, the court cautioned that "income derived in large part from enterprise activity [may not] be ascribed to the property being appraised; instead, it is the earnings from the property itself or from the beneficial use thereof which are to be considered. [Citations.] When no sound or practicable basis appears for apportionment of income as between enterprise activity and the property itself, then a method may be employed which imputes an appropriate income to the property." (*Id.* at p. 584.)

The most compelling authority in this line of cases is *County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445 [262 Cal.Rptr. 439]. The taxpayer, Post-Newsweek, operated a cable TV business under franchises from two cities. The business included many items of obviously

taxable property, such as antennae, coaxial cables, wires and other equipment. The franchise fee paid by Post-Newsweek was 5 percent of its gross receipts. Although the parties agreed that the value of the entire Post-Newsweek enterprise was over $19 million, the tax appeals board (contrary to the position of the tax assessor) determined a value of the taxable property of only $5.4 million. The appellate court reversed on the ground that the appeals board had erroneously excluded from assessment Post-Newsweek's right to use and occupy public rights of way through the cities. (*Id.* at p. 1452.) It affirmed, however, the necessity of separating values ascribed to intangible rights from those related to property rights:

"Franchises or licenses, such as the ones at issue here, consist of essentially two basic components: the right to use the public streets to lay the cables and the right to charge a fee to subscribers for their use of the cable facilities. Although a degree of inseparability exists between the two components of the franchise, the law recognizes the possessory interest is assessable and taxable. [Citation.] The remaining question is whether the second component is also assessable and taxable. [¶] [I]t is only under the state income tax law and not the property tax law that franchises and similar intangible property have been taxed. [¶] Post-Newsweek's position is sound insofar as it contends that its right to engage in the cable television business is not part of the real property possessory interest for assessment purposes. Such a right constitutes an intangible asset which is exempt from tax under the California Constitution. [¶] Our conclusion that the intangible right to do business is not assessable for ad valorem tax purposes, however, does not mean the value of Post-Newsweek's intangible rights may not be considered in assessing the value of the possessory interests. [¶] In valuing Post-Newsweek's possessory interest on remand, the assessor shall consider the intangible right to do business . . . . In so doing, the assessor may impute to the possessory interest an 'appropriate' income from the right to engage in business." (*Id.* at pp. 1452-1456.)

Our conclusion, in applying the learning of these authorities to the facts of our case, is that the assessor and the Board were in error when they utilized Service America's entire income flow (even as adjusted for certain expense factors) as the basis for valuation. Clearly, some "large part" of the income earned by Service America was based on its "enterprise value" as distinguished from the value of its use of property. The judgment of the superior court must therefore be affirmed and its order to reassess Service America's taxable property carried out.

We are confirmed in this conclusion by two very recent cases which addressed issues very similar to the one we face. The first is *County of Los*

*Angeles* v. *County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102 [16 Cal.Rptr.2d 479]. At issue in this case was the valuation of the possessory interest of car rental businesses operating out of airport sales locations under "concession agreements." The factual situation of the taxpayers in this case was somewhat different from that of Service America, in that their businesses utilized operations and services outside the airport as well as inside the public facility. Nevertheless, the court's analysis of the necessity of separation of intangible business values from property values is instructive. It was improper, the court held, for the assessor to reach value by capitalizing the rent-a-cars' total concession fees from the airport operations. These fees were not simply "rents," and the impropriety of the assessment method was that it "fail[ed] to differentiate between the possessory interests in question and the valuable but intangible business opportunities for which the agreements provide[d] and the concession fees also pa[id]." (*Id.* at p. 113.)

The second recent case of interest is *Shubat* v. *Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794 [17 Cal.Rptr.2d 1]. At issue was the assessed valuation of property held by Nor Cal, the owner and operator of a cable TV business. The county sought review of an appeals board decision which allocated a substantial portion of Nor Cal's business value to intangible nontaxable assets, such as its franchised right to do business and the going-concern value of its enterprises. (*Id.* at pp. 801-802.) It was the county's position that these rights were part and parcel of the taxable possessory interest and the value thereof should be included in the determination of taxable property valuation. In rejecting this argument the court stated: "Zoning, location and other such attributes relate directly to the real property involved. They are an integral part of and effectively define it. By contrast, intangibles such as going concern or franchise rights relate to the business being conducted on the real property. They relate to the real property only in their connection with the business using it." (*Id.* at p. 803.)

In affirming the trial court's remand of our case for reappraisal by the appeals board we should, if possible, give somewhat more guidance than was attempted by the trial court. Some portion of the profitability of Service America's operation can reasonably be attributable to the taxable property it utilizes. The value of a small trading post in the middle of a government forest is obviously enhanced by the fact of its isolation and exclusivity; its value for ad valorem tax purposes would justifiably be increased substantially above the comparable values of retail establishments not so fortunately located. Service America's possessory interest reasonably can be valued at a sum considerably in excess of the square-foot value of comparable establishments not located in a sports stadium.

On the other hand, the exclusive nature of Service America's concession agreement and its going-business value undoubtedly constitute a major factor in its profitability. The County cannot overlook or ignore these values, which are not taxable, when assessing value. What does this mean in terms of reappraisal? It seems to us that some form of "imputed" value must be utilized by the assessor to determine a fair "rental" value for the property. As we have stated, this imputed value need not be limited by consideration of comparable values for rental properties not associated with a stadium. Obviously whatever final computation is made will bear some characteristics of arbitrary selection. The appeals board may determine that some factor of increase over comparable values is appropriate—150 percent or 200 percent or some other percentage. Whatever imputed value is selected, however, will presumably not result in complete utilization of the agreed $19 million valuation of the total enterprise. The excess of the $19 million over the imputed value of the possessory interest will then appropriately relate to the intangible, nontaxable, assets Service America admittedly possesses.

## DISPOSITION

The judgment of the trial court is affirmed, and the case returned for reassessment by the Board in accordance with the standards set forth herein.

Todd, Acting P. J., and Nares, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 26, 1993. Kennard J., was of the opinion that the petition should be granted.