Filed 1/31/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DFS GROUP, L.P.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF SAN MATEO,<br><br>    Defendant and Respondent. | A150162<br><br>(San Mateo County<br>Super. Ct. No. CIV531813) |

DFS Group, L.P. (DFS), which engages in the business of duty-free sales at airports around the country, holds an exclusive lease and concession to sell merchandise duty-free at San Francisco International Airport (SFO), in retail space located within SFO's international terminal.[1]  This dispute concerns the San Mateo County Assessor's (Assessor) reassessment of the value, for property tax purposes, of the possessory interests DFS obtained under a seven-year extension of its agreement with SFO.

At issue is whether the Assessor's valuation methodology, by including the value of DFS's exclusive concession rights, violated Revenue and Taxation Code provisions that bar the taxation of intangible rights.[2]  Among them, section 110, subdivision (d)(3) expressly exempts from taxation the exclusive right to operate a concession.  It states: "The exclusive nature of a concession, franchise, or similar agreement, whether de jure or

---

[1] San Francisco International Airport is owned and operated by the City and County of San Francisco, and the agreement at the heart of this dispute is thus between DFS and the City and County.  For convenience, we refer to the City and County and its airport collectively as "SFO."

[2] Except as otherwise indicated, statutory references are to the Revenue and Taxation Code.

de facto, is an intangible asset that shall not enhance the value of taxable property, including real property."

The Assessor utilized a valuation methodology known as the income method (also called the "capitalization" method), which estimates the fair market value of an income-producing property by calculating the property's expected future income stream. (See *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 604–605 (*Elk Hills*).) Under that approach, "an appraiser 'estimates the future income stream a prospective purchaser could expect to receive from the enterprise and then discounts that amount to a present value by use of a capitalization rate.' "[3] (*Id.* at p. 604.) There is no dispute in this case that the Assessor properly used the income method rather than another valuation methodology. Rather, the dispute turns on how the Assessor applied that methodology; in particular, on just a single input in its analysis.

In applying the income method, the Assessor valued DFS's leasehold interest at SFO based upon the entire fee DFS was required to pay SFO for its rights under their agreement during the seven-year extension period, in effect treating that entire amount as economic rent. That fee was a minimum annual guaranteed amount, applicable when DFS's gross revenues failed to meet targeted thresholds. DFS contends that this minimum annual payment to SFO was consideration not only for its taxable use and occupancy of space at SFO but also for the valuable but non-taxable exclusive concession rights it obtained under the agreement to sell merchandise on a duty-free basis at SFO. It argues that by capitalizing the entire payment without deducting the value of its exclusive concession rights, the Assessor directly taxed those non-taxable intangible rights in violation of sections 110, subdivision (d) and 212, subdivision (c). We agree and reverse

---

[3] " ' "The income approach may be called the capitalization method because capitalizing is the process of converting an income stream into a capital sum, i.e., value." [Citations.] The assessor capitalizes "the sum of anticipated future installments of net income from the property, less an allowance for interest and the risk of partial or no receipt." ' " (*Freeport-McMoran Resource Partners v. County of Lake* (1993) 12 Cal.App.4th 634, 642.)

2

the decision of the trial court affirming the Assessment Appeals Board (Board) decision that approved the Assessor's methodology.

Sections 110, subdivision (d) and 212, subdivision (c) generally exempt intangible assets and rights from taxation. (§§ 110, subd. (d)(1), (3), 212, subd. (c).) These provisions, adopted in 1995, implement California's constitutional prohibition on the taxation of intangible assets and rights (with exceptions not relevant here) and codify the California Supreme Court's decision in *Roehm v. County of Orange* (1948) 32 Cal.2d 280 and its progeny. (See Cal. Const., art. XIII, § 2; *Elk Hills*, *supra*, 57 Cal.4th at pp. 607, 617.)

Section 212, subdivision (c) provides, "Intangible assets and rights are exempt from taxation and, except as otherwise provided in the following sentence, the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property. Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." (§ 212, subd. (c).)

Similarly, section 110, subdivision (d), which defines "fair market value" and "full cash value," provides in relevant part: "Except as provided in subdivision (e), for purposes of determining the 'full cash value' or 'fair market value' of any taxable property, all of the following shall apply: [¶] (1) The value of intangible assets and rights relating to the going concern value of a business using taxable property shall not enhance or be reflected in the value of the taxable property. [¶] (2) If the principle of unit valuation is used to value properties that are operated as a unit and the unit includes intangible assets and rights, then the fair market value of the taxable property contained within the unit shall be determined by removing from the value of the unit the fair market value of the intangible assets and rights contained within the unit. [¶] (3) The exclusive nature of a concession, franchise, or similar agreement, whether de jure or de facto, is an intangible asset that shall not enhance the value of taxable property, including real property." (§ 110, subd. (d).) Section 110, subdivision (d) thus "prevents the direct

3

taxation of intangible rights and assets when assessors use methods of unit valuation." (*Elk Hills*, *supra*, at p. 608.)  However, section 110 contains the same caveat as section 212, stating that "[t]axable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use."  (§ 110, subd. (e).)

Subdivision (f) adds another caveat.  It states that "[f]or purposes of determining the 'full cash value' or 'fair market value' of real property, intangible attributes of real property shall be reflected in the value of the real property.  These intangible attributes of real property include zoning, location, and other attributes that relate directly to the real property involved."  (§ 110, subd. (f).)

This case concerns the thorny intersection between provisions that, on the one hand, exempt intangible assets and rights from property taxes but, on the other hand, permit taxing authorities to assume the presence of intangible assets and rights that are necessary to put the property to beneficial or productive use.  Our Supreme Court has instructed that these provisions are not mutually exclusive, and that even if an intangible asset is " 'necessary to put the taxable property to beneficial or productive use,' " that asset nonetheless may not be directly taxed.  (*Elk Hills*, *supra*, 57 Cal.4th at p. 614.)  With these general principles in mind, we turn to the facts.

## BACKGROUND

### I.

### *Facts*

In the 1990s, SFO undertook to replace its old international terminal with a new one.  In connection with that project, while construction of the new international terminal ("IT") was still underway, it sought bids for the concession to sell duty-free and other retail merchandise at the new terminal.

It did so in 1998, in a request for proposal and qualifications (RFP) for a "Post-Security Master Retail/Duty-Free Concession in the New International Terminal" at SFO.  The accompanying cover letter invited recipients "to participate in the selection process for the Post-Security Master Retail/Duty-Free Concession (this **'Concession**

4

**Opportunity**'),” described as an “outstanding business opportunity, comprised of twenty-five (25) locations, expand[ing] over 51,900 square feet of concession space in the New International Terminal, which is scheduled to open in May 2000.”  The “locations” or “facilities,” would including four duty-free retail shops comprising about half of the square footage involved, and about twenty other stores selling goods ranging from jewelry and watches to news and sundries.

Details were included in a proposed form of master agreement, which was comprised of a master lease (entitled, “Lease Agreement for Post-Security Master Retail/Duty-Free Concession in the New International Terminal Building at San Francisco International Airport”) and various attachments.  Among its principal terms, the “Permitted Use” was for “[t]he display and retail sale of the merchandise described on the attached *Exhibit B*,” which listed the spaces to be leased by number and described the types of merchandise that could be sold at each.  Merchandise other than duty-free items would be sold “on a non-exclusive basis,” but the winning bidder’s right to sell duty-free merchandise at SFO would be exclusive.  The term of the agreement would be ten years.

The only substantive term open for competitive bidding was price, structured as a minimum guaranteed payment to SFO.  Under the terms of the request for proposal (and accompanying proposed master lease), the winning bidder would be required to pay “rent” consisting of the greater of a Minimum Annual Guarantee (or “MAG”) and the sum of various tiered percentages of gross revenues from retail sales.  The minimum bid was set at a minimum annual guarantee of $25 million.  And the bid form, which stated the bid was submitted “as and for compensation for the privilege of and permission to operate the Concession Opportunity,” contained just a single substantive blank for prospective bidders to fill out:  the amount of the first year’s minimum annual guarantee. Assuming the proposer satisfied minimum qualifications for operating the business and provided satisfactory plans, SFO anticipated the concession opportunity would be awarded to the proposer who bid the highest amount for the MAG.

5

DFS, which had significant experience operating duty-free and other retail concessions at airports, including SFO, was the only qualifying bidder.[4]  It bid $1.1 million above asking, offering a MAG of $26.1 million.

In 1999, SFO accepted DFS's proposal, which its Deputy Director for Business and Finance described as "the largest merchandising contract ever let in the Airport's history."  Thereafter, SFO and DFS executed the final Lease Agreement for Post-Security Master Retail/Duty-Free Concession in the New International Terminal Building at San Francisco International Airport (the Agreement).  Under the Agreement, DFS would lease 29 retail facilities comprising about 58,000 square feet of space in the new IT, of which about 25,000 square feet would provide duty-free merchandise.[5]  Consistent with the RFP, under the Agreement the "Permitted Use" of the leased space was described as "[t]he display and sale of [specified] merchandise," including duty-free merchandise, and DFS's rights to sell duty-free/in bond merchandise were exclusive at the Airport.

Consistent with the bidding documents, DFS agreed to pay monetary consideration structured as a minimum annual guaranteed amount, or if higher, the sum of various tiered percentages of its gross revenues.  Specifically, it agreed to pay "the greater of the Minimum Annual Guarantee . . . and the sum of the following [percentages of gross revenues]."[6]  The MAG was set at $26.1 million for the first year, subject to

---

[4]  In addition to requiring bidders to submit a substantive, sealed bid concerning "the annual rent structure for this Concession Opportunity," the RFP required bidders to submit a second set of materials demonstrating they met SFO's minimum qualifications and that their proposal for meeting SFO's other requirements (in terms of design, construction and other details such as using disadvantaged minority enterprises) was acceptable.

[5]  Of this, two retail outlets covering about 4,600 square feet had been added to the Agreement after the concession was awarded to DFS at the request of SFO, after other bids to operate those outlets had fallen through for other reasons.  The MAG was not increased when these outlets were added.

[6]  For sales other than duty-free sales, the percentages were 12 percent of gross revenues up to $50 million, 14 percent of gross revenues from $50 to $100 million, and 16 percent of gross revenues over $100 million.  For duty-free sales, the thresholds were the same but the percentages were higher:  15, 20 and 25 percent, respectively.

6

annual adjustments for increases in the consumer price index and the number of departing passengers (referred to as "enplanements").

In recognition of the fact that the IT "may be opened in phases," if fewer than 20 arrival/departure gates were available for use at the "Rent Commencement Date," the MAG would be reduced in proportion to the number of gates not yet operating.

DFS and SFO amended the Agreement several times, in ways for the most part not pertinent here. After the terrorist attacks on September 11, 2001, there were several amendments that suspended and then partially reinstated the MAG for a limited time, to alleviate the economic hardship occasioned by the decline in air travel. For purposes of implementing those temporary reductions, the amendments allocated 90 percent of the MAG to duty-free "goods" and 10 percent to duty-paid "goods" (and specified different terms for reinstating the full amount of the MAG as to each).

The Agreement was set to expire in 2010, subject to certain options to extend. Near the end of that term, DFS exercised an option to extend the Agreement by five years, and SFO exercised two one-year options to extend. The MAG to which the parties agreed going forward was $26.4 million.

Under the Agreement with amendments, DFS currently leases more than 59,000 square feet of space and has a concession to sell duty-free and duty-paid merchandise on a retail basis at SFO. About 27,000 square feet of this space is dedicated to DFS's sale of duty-free products. Of the remaining space, DFS operates some duty-paid retail outlets and subleases others to a mix of retail tenants. At no time did DFS's gross revenues ever reach levels at which it was required to pay more than the MAG.[7]

The extension of the Agreement triggered the Assessor's reassessment of DFS's property interest at SFO. As noted, for purposes of the reassessment, the Assessor valued DFS's possessory interest in the leased properties using the income approach. The

---

[7] Indeed, for the first six years the Agreement was in effect prior to the extensions, DFS was not required to pay the full MAG or, in some years, any MAG at all because of the dramatic decline in international travel and corresponding decline in sales in the wake of September 11, 2001.

parties agree this was an appropriate methodology. However, what is in dispute is the income stream used by the Assessor in applying that methodology, which was the full amount of the MAG (for 2011 this was $26.4 million). Capitalizing that entire amount, and after deducting certain expenses and applying a discount factor, the Assessor arrived at a present value for the possessory interest of $59 million.

## II.

### *Assessment Appeals Board Proceedings*

DFS appealed the Assessor's determination to the San Mateo County Assessment Appeals Board (Board), and the matter proceeded to a four-day hearing. The crux of DFS's challenge was its theory that the MAG compensated SFO not only for DFS's use of the space at the airport but also for its exclusive right to operate duty-free concessions there. By failing to deduct the fair market value of the latter right from its valuation, DFS contended, the Assessor's valuation violated sections 110, subdivision (d) and 212 subdivision (c), which exempt intangible assets and right from property taxation.

### A. DFS's Evidence

#### 1. *Lyons*

Joe Lyons, long-time employee and current Vice President of Business Development for DFS, was responsible for negotiating DFS's concession agreements and participated in the submission of DFS's winning bid at SFO.

Lyons testified that DFS operates retail concessions, both duty-free and non-duty-free (or duty-paid), at a number of airports including in San Francisco, Los Angeles, Honolulu and New York (JFK). He explained that duty-free concessions are operated under the auspices of the U.S. Customs Service (Customs) and the federal Bureau of Alcohol, Tobacco and Firearms (ATF). The business consists of selling merchandise that is free of duty and taxes to passengers departing on direct international flights to overseas destinations. The business involves purchasing merchandise from overseas that is entered into the United States "in-bond." Customs regulations require DFS to control the merchandise and keep it secure and to provide documentation of sales. A duty-free

8

business must operate within an airport, where the merchandise is sold or delivered to departing passengers.

The IT at SFO has two concourses, each with food and beverage businesses, retail services, retail products, and each with two duty-free areas. DFS operates the duty-free and some of the duty-paid retail spaces, and its subtenants operate the other duty-paid retail space. Food and beverage concessions are operated by others.

Lyons testified that airports that have robust international traffic generally have duty-free concessions. Some airports in North America do not have a single duty-free provider, but have multiple duty-free operators with concessions at different terminals (i.e., Houston, Chicago O'Hare, New Jersey and New York's Port Authority). However, Lyon was not aware of any duty-free concession in the United States that does not operate exclusively in the terminal it is in.

Lyons testified that in determining what to bid on a duty-free concession, DFS considers a number of factors but that exclusivity is a "big part" of what DFS is paying for. Without it, he testified, DFS would not be able to make enough to pay the MAG.

Lyons testified the MAG, originally set at $26.1 million but later increased to $26.4 million, was compensation for more than simply rental of the space. According to Lyons, the MAG was paid both for the use of the space at the airport and for the right and privilege to operate the business, including the exclusive duty-free concession. Lyons also testified that when SFO and DFS extended the lease in 2010, SFO expected DFS would pay the MAG and not percentage rent over the seven-year term of the extension. SFO was able to raise the MAG to $26.4 million even though it understood that the market rate MAG it could obtain if it rebid the duty-free and duty-paid lease was only $21,940,000.[8]

---

[8] The amendment that extended the lease also required DFS to invest at least $2.4 million in facility renovations and construction during fiscal year 2011. This included construction of one new duty-free store in Terminal 3.

## 2. *Runde*

Timothy Runde, a commercial real estate appraiser, prepared an analysis of the value of DFS's possessory interest based on rental rates of comparable properties. Relying on other leases at SFO (both within the IT and in other terminals), and high-end retail leases in the Union Square and the Fisherman's Wharf areas of San Francisco, he calculated that the total market rent for all DFS's leased space at SFO was approximately $14 million. Using that figure in an income analysis, he concluded that the fair market value of DFS's possessory interest at SFO was approximately $30,660,000, which was approximately one-half of the value the Assessor had ascribed to it.

## 3. *O'Connor*

DFS also proffered the opinion of Mary O'Connor, an expert in valuing business enterprises and intangible assets, who valued DFS's exclusive right to engage in duty-free sales at SFO during the relevant period at approximately $28.6 million.[9] Deducting that amount for the entire capitalized MAG, she estimated the rental value of just the physical property at SFO, exclusive of DFS's intangible franchise right, at approximately $15.4 million.

As part of her approach, O'Connor determined a separate stream of revenue attributable to the exclusive right to operate the duty-free concession at SFO. She testified that the right to do business offering duty-free goods with exclusivity is very attractive. One indication of its value here was that DFS's duty-free sales represented about 70 percent of its total sales revenue in 2010 ($70 million of about $100 million in total revenue) and its duty-paid sales only 30 percent (about $30 million), even though the square footage devoted to the two categories of retail operations was approximately equal.

O'Connor also testified about the importance of the right of exclusivity for businesses such as DFS. She explained that the business model for a duty-free business

---

[9] O'Connor's methodology for valuing the duty-free concession involved comparing DFS's fee for duty-free sales with its fee for duty-paid sales. We omit the details.

10

does not depend on the seller's brand name, but rather on the brand names of its merchandise and the lack of duties or taxes. Without exclusivity, she testified, there would be no way to differentiate one duty-free seller from another, with the result that there would be pure price competition and the business with the highest costs would drop out. Exclusivity is thus essential to the business, she opined, and DFS is willing to pay extra money for it and would have no interest in being at SFO without it. At other airports too, she testified, "there's a substantial premium [in concession fees] for doing duty-free businesses."

## B. The Assessor's Evidence

### 1. *Tharayil*

To rebut the analysis of DFS's commercial real estate appraiser, Runde, the Board called Alex Tharayil, a long-time former appraiser from the San Francisco City and County Assessor's Office.

Tharayil acknowledged that the right to sell duty-free is a "big right" but criticized Runde's valuation as "totally invalid." Principally, Tharayil disagreed with Runde's choice of comparable properties and his failure to make adjustments for various attributes of those other properties, including their lack of the right to sell duty-free. He also faulted Runde for not taking into account that the rights SFO gave DFS are a government-created, legally permitted use. In Tharayil's view, the rights SFO gave DFS to sell duty-free are a property right, that is, a right to occupy space, because they were given by a public entity.

### 2. *Andersen*

The Assessor also called the person who performed the challenged assessment in question, Stephen Andersen, a senior appraiser in the Assessor's office.

Andersen explained his valuation methodology. As noted, he testified that he used the income method. He testified that in deciding which of the Agreement's two documented income streams to use in his analysis, he chose the MAG rather than the

11

percentage-based tiered rents because the MAG was guaranteed revenue to the airport.[10] And he treated the MAG as economic rent for the property. Andersen assessed the possessory interest at its highest and best uses, which he testified were duty-free retail, duty-paid retail and storage, all distinct permitted uses. Using leases at several other international airports as comparables (both duty-free and duty-paid sales and rents), he concluded that DFS's rent at SFO was market rate for a similar location.[11]

Andersen recognized that payments to a public entity that are not made as consideration for real property must be excluded from economic rent but, based on his interpretation of the Agreement, he considered the MAG as a payment solely for rights in real property. In his view, it represented the minimal annual guarantee SFO would accept for DFS's possessory interest rights to occupy and use the real property only, and that any other rights under the Agreement, including the right to operate a retail business, were compensated by other consideration under the Agreement.

In particular, Andersen believed the percentage rents constituted consideration for DFS's exclusive concession right. He took this view even though he acknowledged the Agreement did not make exclusivity contingent on DFS exceeding the MAG (and thereby paying any percentage rents), and even though the non-duty-free retail spaces were also subject to a percentage rent structure. And he testified, based on "logic," that the value of DFS's exclusive right to sell duty-free was not due to exclusivity but, rather, the right to sell duty-free.

### C. DFS's Rebuttal Evidence

On rebuttal, DFS's board member Lyons testified that airports decide whether to have duty-free concessions at all, and whether to make them exclusive. He also testified

---

[10] With storage space included, the MAG was $26,589,983. The storage space accounted for $189,000. DFS only capitalized the master lease and not the storage space.

[11] Like Tharayil, Andersen also disagreed with several of Runde's choices of comparable properties for various reasons (in particular, Union Square and Fisherman's Wharf).

that exclusivity of the duty-free concession at SFO was a "major part" in DFS bidding the amount it did, and that without it DFS would have bid a lower MAG.

### D. The Board's Decision

The Board denied DFS's appeal and affirmed the Assessor's determination. It concluded that the MAG was an appropriate measure of economic rent and was appropriately used.

In reaching this conclusion, it interpreted the MAG as consideration solely for the right to occupy space and not for any additional rights. That interpretation was based on certain provisions of the Agreement tying the MAG to the amount of leased space (for example, option provisions that allow SFO to reduce the size of the premises with a proportionate reduction in the MAG).

The Board did not find that the exclusivity of DFS's right to sell duty-free goods at SFO had no value. However, the record, in its view, did not indicate that its value was "embedded within the MAG paid by DFS." The Board reasoned that unlike provisions linking the MAG to square footage of the premises, there were no provisions "establish[ing] a similar relationship between the MAG and exclusivity." The Board also opined that the fact that DFS did not attempt during negotiations for the Agreement or the extensions of the Agreement "to assign or calculate the value of exclusivity" indicated that the MAG did not include a payment for exclusivity. It hypothesized that "SFO might reasonably [have] decide[d]" not to require bidders to pay for the entire value of exclusivity, because without exclusivity the business would fail which would not be in the interest of airport authorities, and that DFS may have compensated SFO for exclusivity in other ways under the Agreement, such as by agreeing to act as a landlord to subtenants, to restrict its pricing and merchandise in various ways, to pay for improvements or by bringing its experience to bear.

For reasons not pertinent here, the Board also rejected O'Connor's valuation of DFS's intangible franchise operating rights, rejected Runde's analysis of comparable rents, and considered the Assessor's sales and rent figures at other airports to be more comparable.

13

## E. Refund Action

DFS challenged the Board's decision by filing a complaint for refund in the San Mateo County Superior Court. That court affirmed the Board's decision and issued judgment for the County. Because the Board and the Assessor are both agencies of the County and are aligned in their position, hereafter we will refer to them collectively as "the County."

## DISCUSSION

The parties agree that the income capitalization method is an appropriate valuation method in this case and, furthermore, that it was appropriate to use the minimum annual guaranteed amount of "rent" (i.e., the MAG) to determine DFS's income from the property. The primary issue is whether the income to be capitalized should be that entire amount of monetary consideration reflected in the Agreement, or instead that amount reduced by the value of DFS's exclusive right to sell duty-free goods, which the parties agree is an intangible interest.

DFS contends the Assessor violated the prohibition on taxing its intangible exclusive right to sell duty-free goods at SFO by failing to segregate the portion of the MAG it paid SFO for that intangible right from the portion it paid for the use of the real property at SFO. The County, on the other hand, contends that capitalizing the entire MAG was proper under section 110, subdivision (e), because doing so merely assumed the presence of intangible rights that were necessary to put the property to its highest and best use, i.e., selling duty-free merchandise. In the alternative, it argues that the exclusive right to sell duty-free goods at SFO, while intangible, is taxable under section 110, subdivision (f) as an "attribute of the real property" DFS leased from SFO.

These issues, going to the validity of the assessor's valuation method, present questions of law we review de novo.[12] (See *Elk Hills*, *supra*, 57 Cal.4th at p. 606; accord, *GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992,

---

[12] The County concedes this in its brief, acknowledging that "[w]hether an intangible asset has been included in an assessment is a question of law."

1001; *SHC Half Moon Bay, LLC v. County of San Mateo* (2014) 226 Cal.App.4th 471, 476, 488–489 (*SHC*).)  Were any facts in dispute, we would apply the substantial evidence standard.  (See *Elk Hills*, at p. 606.)  However, the relevant facts here are undisputed.

## I.

### *The Burden of Proof*

Before turning to substance, we first address a procedural matter to which the County devotes much of its brief, namely the argument that DFS failed to satisfy its burden of proof to show the assessed value was erroneous.  Specifically, the County contends DFS was required to, but did not, establish the fair market value of its possessory interest and the value of the exclusive right to sell duty-free goods at SFO.  It criticizes the evidence DFS proffered concerning the value of its possessory and intangible rights, and argues the Board had discretion to reject those valuations.

These arguments are premised on a misunderstanding of the law.  To be sure, it was the taxpayer's burden to show the Assessor erred in its valuation by including the value of intangibles in its assessment.  (*SHC*, *supra*, 226 Cal.App.4th at pp. 492–493.)  As stated in *Elk Hills*, the taxpayer must "put forth credible evidence that the fair market value of those assets has been improperly subsumed in the valuation."  (*Elk Hills*, *supra*, 57 Cal.4th at p. 615.)  But this does not mean DFS had to satisfy the Board that its own valuations of the possessory and intangible interests were correct.  "The issue we must resolve is not whether [the taxpayer's] calculations can be approved, or even whether its methodology is acceptable, but whether the County's approach is valid."  (*Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232, 1237 (*Service America*).)  As in *Service America*, this question rests on whether the method used by the Assessor, i.e., capitalizing the entire income stream payable to the City under the concession Agreement, is correct, a question the court treated as a legal one because the facts were not in dispute.  (See *id*. at p. 1235.)  The trial court in *Service America* ruled that the assessor's methodology was incorrect, but "[w]ith commendable deference to the administrative board, the judge admitted he was 'not prepared to declare the correct

methodology,' but issued a writ of mandamus to the Board requiring it to 'set aside its decision . . . to reconsider its action . . . and to take any further action specifically enjoined on it by law.' " (*Id*. at p. 1234.) The appellate court agreed with this approach. (*Id.* at pp. 1241–1242.)

So here, while the parties argue about whether DFS's valuations were correct and whether the Board erred in rejecting them, that is not the primary issue before this court. Rather, the primary question is whether the *County's* approach is valid. On that issue, as we next explain, DFS met its burden of proof to show the County utilized a legally erroneous methodology. It is undisputed that the Assessor capitalized the entire income stream payable to SFO under the Agreement and assumed it represented rent for the possessory interest alone. Yet DFS established (and the County does not dispute) that the exclusive concession right the Agreement also conferred on DFS was valuable, and the Assessor made no attempt to remove that value from that income stream before capitalizing it. As we next explain, that approach was legally erroneous. The County's argument that DFS additionally had to prove the actual value of its possessory and intangible interests to the satisfaction of the Board, is without merit as *Service America* plainly demonstrates.[13]

## II.

### *Including the Value of the Exclusive Duty-Free Concession in the Assessor's Income Stream Analysis Did Not Merely "Assume Its Presence" for Purposes of Fair Market Valuation.*

#### A. Legal Principles

Not all intangible rights must be deducted under an income approach to valuation. The leading authority on the legal issue presented here is our Supreme Court's decision in *Elk Hills*, which harmonized subdivisions (d) and (e) of section 110 as "contain[ing] nonconflicting principles that must be applied together." (*Elk Hills*, *supra*, 57 Cal.4th at

---

[13] Because we reject the County's argument that DFS was required to prove the value of its intangible concession interest and its possessory interest, we do not address its contentions or DFS's response regarding whether the Board correctly rejected DFS's valuation evidence.

16

p. 610.) It explained that "although assessors may assume the presence of intangibles when considering the income stream derived from taxable property that is put to beneficial or productive use (§ 110[, subd.] (e)), the value of intangibles that *directly* enhance that income stream cannot be subsumed in the valuation of taxable property (§110[, subd.] (d)(1)), and must be deducted from the unit prior to assessment (§ 110[, subd.] (d)(2))." (*Id*. at p. 618, italics added.) The court interpreted section 110 as requiring the assessing entity conducting an income analysis to deduct the fair market value of intangible assets with "a *direct* contribution to the going concern value of the business," including "intangible assets like the goodwill of a business, customer base, and *favorable franchise terms or operating contracts*." (*Elk Hills*, at pp. 618–619, italics added.) By contrast, the court explained, intangible rights that "merely allow for the taxable property to generate income when put to its beneficial or productive use" have only an "indirect" contribution to income stream, and therefore warrant no deduction. (*Ibid*.)

At issue in *Elk Hills* was the valuation of a powerplant. Judged by the standard quoted above, the court held that the value attributable to environmental credits the powerplant was legally required to purchase in order to operate (emission reduction credits, or ERCs) was not required to be deducted from the income stream of the power plant. The sole purpose of the ERCs, it explained, "is to enable the taxable property in question to function and produce income as a powerplant, thereby enhancing the value of that property." (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.) The taxpayer made "no credible showing that there is a separate stream of income related to enterprise activity or even a separate stream of income at all that is attributable to the ERCs in this case." (*Id*. at p. 602.) There was thus no indication the State Board of Equalization did anything other than " 'assum[e] [the ERCs] presence' in order to tax the property in question as a fully functioning powerplant." (*Id*. at p. 619.)

By contrast, the principle that a taxing agency using the income approach must deduct the value of "intangible assets like . . . favorable franchise terms or operating contracts" (*Elk Hills*, *supra*, 57 Cal.4th at pp. 618–619) is reflected in two earlier cases

17

the court cited with approval, *Service America*, *supra*, 15 Cal.App.4th 1232 and *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102 (*County of Los Angeles*).  (See *Elk Hills*, at pp. 610–611.)

Service America concerned the valuation of an exclusive concession agreement to sell food and beverages at a municipal sports stadium.  (*Service America*, *supra*, 15 Cal.App.4th at p. 1236.)  The concession fee the taxpayer paid for the exclusive concession rights was based on a percentage of its gross sales.  (*Ibid*.)  In applying the income method, the assessor capitalized the entire amount of the estimated concession fee the taxpayer was projected to pay during the term of the agreement, on the assumption the fee represented rent for its use and occupancy of the stadium.  (*Id*. at pp. 1236–1237.)  The taxpayer challenged the assessment, claiming the concession fee included "a substantial sum representing consideration for rights and interests other than those associated with the occupancy or use of property."  (*Id*. at p. 1237.)  Recognizing there was "no accurate way of separating the portion of the concession fee related to the use of property from the portion of the fee based on other considerations" (*ibid*.), the appellate court nonetheless held that the assessor and the Board erred in capitalizing the entire concession fee.  While it recognized that "[s]ome portion of the profitability of Service America's operation can reasonably be attributable to the taxable property it utilizes," the court held that, "[o]n the other hand, the exclusive nature of Service America's concession agreement and its going-business value undoubtedly constitute a major factor in its profitability" and that "[t]he County cannot overlook or ignore these values, which are not taxable, when assessing value."  (*Id*. at pp. 1241–1242.)  While it did not determine what the assessed value should have been, it suggested that "some form of 'imputed' value must be utilized by the assessor to determine a fair 'rental' value for the property."  (*Id*. at p. 1242.)  It recognized that property in the stadium would have greater rental value than rental values associated with other kinds of properties, but concluded, "Whatever imputed value is selected . . . will presumably not result in complete utilization of the agreed $19 million valuation of the total enterprise."  (*Ibid*.)

18

Similarly, *County of Los Angeles* held that a tax assessor had erred in basing its assessment of rental car companies' interests at three Southern California airports on the entire concession fees they paid, because encompassed within those fees were nontaxable intangibles including the companies' rights to do business at the airports. The agreements between the rental car companies and the airports granted "both the right to conduct a car rental business at the particular airport and the right to occupy and use certain limited portions of it." (*County of Los Angeles*, *supra*, 13 Cal.App.4th at p. 105.) The assessor there had capitalized the companies' entire concession fees, which were measured as a percentage of their income from their airport area operations, characterizing the payments as "rents" paid for the companies' possessory interests at the airports. (*Id.* at pp. 112–113.) Although the assessor was entitled to tax any possessory interests created by the concession agreements, "*[t]he further rights granted by the agreements, to do business at the airports and their environs, are not possessory interests*. They are intangibles, not subject to property (possessory interest) tax." (*Id.* at p. 112, italics added.) The assessor had erred, the court held, because its method "fail[ed] to differentiate between the possessory interests in question and the valuable but intangible business opportunities for which the agreements provide and the concession fees also pay." (*Id.* at p. 113.)

As we next explain, although the facts of this case differ in some respects from those in *Service America* and *County of Los Angeles*, the courts' analyses in those cases compel the same result here.

### B. DFS's Exclusive Duty-Free Concession Is a Valuable Right Under the Parties' Agreement.

DFS met its burden to prove that the exclusive duty-free concession rights it enjoyed under the Agreement were valuable, a point we do not understand the County to dispute. It is unnecessary to summarize all of the evidence in the record showing just how lucrative a business opportunity this was, which was considerable.[14] Even the

---

[14] This included not only Lyon's testimony that DFS could not make enough money to pay the MAG without the exclusive concession right and that exclusivity was a

deputy assessor who performed the valuation, Andersen, acknowledged the right to sell duty-free is a "big right," and although he testified (based on "logic") the exclusivity component added no value, the Board found otherwise. On appeal, the County does not dispute the Board's finding that the exclusive right has value. Thus, unlike the emission reduction credits at issue in *Elk Hills* that were not directly related to the powerplant's enterprise activity, the purpose of the concession right to sell duty-free products at SFO, and to do so without competition, is not solely "to enable the taxable property in question to function and produce income." (*Elk Hills*, *supra*, 57 Cal.4th at p. 619.) Rather, that exclusive duty-free concession right directly contributed to DFS's ability to operate its business profitably.

That leaves only the question, then, whether this valuable right was a part of the bundle of rights for which DFS bargained when it agreed to pay, and paid, the MAG.[15] If it was, then the Assessor erred by including its value in the income valuation. We conclude it was.

---

major factor in its bid for the MAG. SFO's offering prospectus compared historical sales per square foot of duty-free goods, food and beverage sales, and other retail merchandise. The revenue from duty-free sales was nine to ten times the revenue from the sale of food and beverages on a per-square-foot basis, and three to four times the sales revenue from duty-paid merchandise. Specifically, in the five years prior to 1999, duty-free sales at SFO ranged from $4,117 to $5,997 per square foot as compared to $431 to $669 for food and beverage sales, and $1,239 to $1,474 for sales of non-duty-free retail merchandise. The parties submitted industry data about other international airports with duty-free concessions for 2009, 2010 and 2011, from which similarly disparate sales per square foot figures for duty-free and other types of concessions can be determined. Finally, DFS introduced evidence that 70 percent of its SFO revenues were derived from its duty-free concessions, even though those concessions occupied only about half of the space it occupied there. The evidence also demonstrated that at SFO and other airports with duty-free concessions, significantly higher amounts were paid for duty-free concessions than for other types of concessions.

[15] The precise value of DFS's exclusive concession right is disputed, and we do not resolve that issue here. The Assessor and the Board rejected the only evidence placing a value on that right, which was the opinion of DFS's expert, O'Connor. On remand, the Board may revisit this issue and, if it is appropriate, permit the parties to submit additional evidence.

## C. The Agreement Conveyed to DFS Both Tangible Property Rights and Intangible Concession Rights, and the MAG Was Consideration for Both.

As the Board recognized, the issue of whether the MAG was consideration for the exclusive franchise right turns on interpreting the Agreement. And the basic tenets of contract interpretation are well established. "Interpretation of a contract consists of ascertaining the meaning to be given to the expression of the parties." (1 Witkin, Summary of Cal. Law (11th ed. 2018) Contracts, § 764; see Civ. Code, § 1636.) "Where the language of a contract is clear and not absurd, it will be followed." (1 Witkin, *supra*, § 764.) We construe the contract as a whole, "so as to give effect to every part." (*Id*., § 769; Civ. Code, § 1641.) We accord the words of a contract their ordinary meaning unless otherwise indicated. (1 Witkin, *supra*, § 768; Civ. Code, § 1644.) " 'A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.' ([Civ. Code, §] 1647.) 'For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the Judge be placed in the position of those whose language he is to interpret.' ([Code Civ. Proc., §] 1860.)" (1 Witkin, *supra*, § 771.)

As DFS points out (and the County does not dispute), contract interpretation is an issue of law, which we review de novo, including where undisputed parol evidence sheds light on the parties' intent. (*Parsons v. Bristol Development Co*. (1965) 62 Cal.2d 861, 865 ["It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns on the credibility of extrinsic evidence"].)

Starting first by examining the words of the Agreement, the Agreement's actual language is inconclusive as to whether the MAG included compensation for the exclusive right to sell merchandise duty-free or whether, as found by the Board, it was solely compensation for DFS's possessory interest.[16] The Agreement does not expressly state

---

[16] In considering this question we disregard all titles and captions, because the parties expressly agreed they were irrelevant for purposes of interpreting the Agreement and not intended to carry substantive meaning.

one way or the other. And the Board's analysis of the Agreement's plain language was flawed, because it focused on provisions that on their face shed no light on this question.[17] The only words that arguably support the latter interpretation is the Agreement's characterization of DFS's monetary payments to SFO as "rent." In pertinent part, Paragraph 4.3 states that DFS "shall pay, as rent for the Premises, estimated monthly Base Rent." "Base Rent" is then defined as the greater of the MAG or specified tiered percentage rents. According this terminology its ordinary meaning (Civ. Code, § 1644), this language in isolation could be understood to mean that Base Rent, including the MAG, was consideration solely for DFS's use and occupancy of the space. But for several reasons, a different meaning other than its ordinary one is indicated. (*Ibid.*) Such a cramped construction is defied by the entire commercial

---

[17] In concluding that the MAG was economic rent for the possessory interest alone, the Board relied heavily on two provisions that link the MAG to the amount of space leased: section 1.2, governing relocations, which provides that expansions or reductions of more than 10 percent of the premises occurring as part of a relocation would result in a pro rata adjustment to the MAG based on the size of the replacement premises; and section 2.2, which gave SFO two one-year options to extend the term of the Agreement as to some (or all) facilities and provides that the MAG and the percentage rent thresholds will be reduced pro rata based on any square footage that was not retained. These provisions tying the amount of the MAG to square footage certainly indicate the MAG was intended at least in part as compensation for the use and occupancy of the leased space. They do not demonstrate, though, that the MAG was not *also* consideration for the concession rights. On the contrary, the concession rights and the amount of space leased were interdependent. The more space provided, the greater the amount of merchandise DFS and its subtenants could display and, presumably, sell. Thus, a reduction in space would affect the value not only of the possessory interest but also the value of the exclusive concession rights.

　　The Board also relied on section 5.4(f), which caps the amount DFS may charge a subtenant at the total amount it pays SFO for "the portion of the Premises subleased by the subtenant," and for the first year, at the pro rata amount of the MAG attributable to the subtenant premises. This provision does not establish what was in fact charged by DFS for the subleased space; rather it is a cap on what DFS could charge subtenants, the obvious purpose of which was to prevent DFS from profiting on subleases by charging a premium over what DFS was paying SFO for the same concession space.

22

context of this contract, including the parties' later course of conduct, and would lead to an absurd, illogical result.

In the first place, construing "rent" as meaning compensation solely for use and occupancy, and not also compensation for the valuable exclusive concession right, is internally inconsistent. That is because the Agreement characterizes both forms of monetary compensation as rent: both the MAG, and the tiered percentages. Deputy Assessor Andersen suggested in his testimony before the Board, and the County's brief on appeal similarly implies, that the tiered percentage compensation structure alone provides compensation for the exclusive duty-free concession. But the term "rent" cannot mean one thing as applied to the MAG, namely compensation for the possessory interest, and quite another as applied to the alternative percentage-based compensation, namely consideration for the concession. As used in this context, the term "rent" is just synonymous with "monetary consideration." The question is, for what?

The entire context of the bidding process, and the language the parties used to describe it, demonstrate that DFS, in bidding the MAG that it did—a MAG that was $1.1 million above SFO's minimum required figure—did not bid monetary compensation solely to secure a retail space. It bid for *the business opportunity* at SFO, and the possessory interest alone was not solely or even primarily what SFO advertised or DFS bid on. Rather, the possessory interest was a necessary adjunct of the business opportunity. Indeed, the commercial context shows that SFO did not seek a tenant but rather a reliable business partner that could exploit the duty-free opportunities at the airport to the parties' mutual economic advantage. They were akin to partners in a joint venture in which DFS would provide services and know-how, SFO would provide space and both would profit from the opportunity. Simply put, and contrary to the County's portrayal, DFS's role in this transaction was not that of a mere purveyor of goods, in search of a suitable brick-and-mortar location to hawk its wares, and SFO was not merely a landlord offering to lease space to the highest bidder.

Thus, in the documentation accompanying SFO's invitation to bid, SFO repeatedly described this opportunity not as a potential real estate transaction but as a "concession

23

opportunity" and an "outstanding business opportunity."  Further, there were the bidding requirements, which reflected an overall principal concern not just with a tenant's credit-worthiness but the bidder's business acumen and ability to develop a financially viable, economically profitable merchandising program.[18]  And then, of course, all these bidding requirements culminated in the bid form itself, which stated that the bidder "submits this bid *as and for compensation for the privilege of and permission to operate the Concession Opportunity*."  (Italics added.)  Finally, during the San Francisco Airport Commission hearing at which DFS's bid was approved, SFO's deputy director of business and finance described the Agreement as "the largest merchandising contract ever let in the Airport's history" and "the cornerstone of what will be a fabulous new program."  All this undisputed extrinsic evidence concerning the bidding process makes plain SFO's understanding of what it was selling in exchange for the MAG:  not a mere possessory interest at the international terminal, but a valuable business opportunity from which it expected to mutually profit.[19]

The terms of the Agreement confirm this.  The Agreement conveys far more than a possessory interest in SFO's IT, and in doing so not only allows DFS to operate an

---

[18]  Chief among these was the requirement that bidders meet minimum qualifications relating to their business and financial experience, including three years of "experience in the ownership or management of a retail merchandise business (including duty-free)" that had achieved gross revenues of at least $100 million per year.  Bidders also were required to "describe in detail the proposed retail concept for each facility and how the concepts will complement the surrounding shops."  And SFO expressed interest in participants' ability "to deliver exciting local brand names and other high quality retail and duty-free merchandise" and to "offer the most exciting blend of design and concept execution for the attraction of optimum sales from Airport passengers."  SFO required a minimum investment of $7.8 million in improvements to the premises, and bidders were required to describe a staffing plan, cash control system, delivery schedule and logistics, and customer service philosophy and program.

[19]  SFO would profit greatly from the MAG itself, which guaranteed a per-square-foot rate much higher than other kinds of concessionaires paid for similar space (see footnote 14, *ante*, pages 19–20) and it would profit still further from percentage rents if DFS's revenues reached the threshold levels triggering the obligation to pay percentage rents.

24

exclusive duty-free concession there but requires DFS to carry out that business in a manner that maximizes SFO's own bottom-line. This is evident from the Agreement's very first page, where its recitals characterize DFS's role as that of a service provider, not a tenant: it states that DFS "desire[d] to provide and operate the *service* described in the Permitted Use at the Airport and [SFO] ha[d] determined such *service* would be an accommodation and convenience for airline passengers and the public." (Italics added.) Next, Part 3 of the Agreement obligates DFS to operate its business at SFO "so as to maximize Gross Revenues," and it regulates certain aspects of retail operations in a manner consistent with that goal.[20] The reason for these requirements, of course, is because the higher the gross revenues DFS achieved, the more "rent" SFO could expect in return for this "concession opportunity," as SFO repeatedly described it. Finally, section 4.10 of the Agreement proportionately reduces the MAG if delays in completing construction or factors resulted in fewer functioning arrival/departure gates than planned at the time DFS's rent obligation commences. This provision reflects that the MAG was understood by the parties as consideration for the profitable business opportunity the Agreement was providing; if unplanned circumstances reduced the profitability of that opportunity, the MAG would be commensurately reduced.

To construe DFS's monetary bid as including no compensation for the valuable exclusive concession rights it obtained makes no economic sense, from either party's perspective. This is evident from the entire focus of the bidding process, and from Lyon's uncontradicted testimony that without this exclusive right DFS would not have bid $26.4 million and could not have afforded to pay the MAG. It is also evident from the undisputed evidence demonstrating that duty-free concessions are highly profitable

---

[20] For example, it includes the requirement DFS conduct business in a first-class, safe and efficient manner, carry a wide range of top quality merchandise and employ sufficient and experienced staff. It also requires DFS to use at least 85 percent of the Premises for display and sale of retail merchandise and requires it to keep the Premises open for 16 hours every day and to charge prices comparable to those found in DFS's catalog, if any, and at its other retail shops or a local comparable retail shop.

and highly valued, and that entities that acquire duty-free concession rights at airports pay significantly more for them than they or others are willing to pay for space used for other kinds of concessions. (See footnote 14 and accompanying text, *ante*, pages 19–20.) SFO had every incentive to extract through the MAG as much as it could get for the entire opportunity, including the exclusive concession right; to have charged only what it could get merely as rent for the physical space would be to leave serious money on the table. Conversely, DFS had every incentive to offer serious money to try to win the concession, which it did when it offered a sizable MAG ($1.1 million above the minimum required bid).

Finally, two subsequent events confirm the parties' understanding that the MAG did not compensate SFO solely for the use of physical space. One is the amendment that changed the MAG temporarily in the wake of 9/11. The parties recited in that amendment that because of the September 11, 2001 terrorist attacks and their "extraordinary and unexpected effects on travel worldwide," "many of the Airport's concession tenants have represented that they are unable to conduct their businesses under the existing terms of their respective Airport leases." As part of a support program for its concession tenants, SFO amended the Agreement to temporarily suspend the MAG on all sales. DFS was instead required to pay percentage rent, but the thresholds for percentage-based rent on duty-free sales were reduced. The amendment further provided for reinstatement of "the MAG applicable to duty-free goods," which it defined as 90 percent of the MAG, by the earlier of a specified date or once DFS had achieved $5 million in monthly gross revenues on duty-free sales for two consecutive months. By expressly referring to "the MAG applicable to duty-free goods," the amendment's plain language demonstrates the parties understood that some portion of the MAG, at least, was intended as compensation for the right not to occupy physical space but to sell duty-free goods. And the same is true in substance: by tying the suspension of the MAG to the decline in air travel and the associated decline in the profitability of DFS's businesses, the amendment reflects the parties' understanding that the MAG was compensation for the opportunity "to conduct [its] business[]," because favorable business conditions had

26

been negatively impacted by the events of September 11. Similarly, by tying the reinstatement of the duty-free portion of the MAG to DFS achieving a threshold level of success on its duty-free sales (*i.e.*, the 90 percent of the MAG the amendment attributed to the duty-free concession), the amendment reflects the parties' understanding that the *MAG* was consideration, in no small part, for the duty-free concession rights DFS acquired under the Agreement. In short, when the concession right was devalued by the events of September 11, DFS was given a reprieve from paying the MAG notwithstanding its continued use and occupancy of the space in the IT. The concession opportunity was worth less not because the size or quality of the space had changed, but because of external events that interfered with DFS's ability to successfully operate its concessions.

Second, there is the uncontradicted evidence that in late 2009, and again in early 2010, when DFS and SFO exercised options to extend the Agreement by a total of seven years, it had become clear that the MAG was so high that it was unlikely the percentage rents would ever to come into play. Whatever may have been SFO's expectation when the Agreement was first entered in 1999, by the time of those extensions SFO expected— based on its projections of DFS's gross sales—that DFS would not likely reach the sales thresholds required to trigger the percentage rents and would pay only the MAG (which had been adjusted upward to $26.4 million). This fact, that SFO expected the MAG to serve as the *entire* monetary consideration, makes it implausible to believe it was consideration only for the use of the space. Even if we accepted the County's assertion that only the percentage rents were intended as consideration for the concession rights at the outset, which we do not, SFO's expectation by the time of the extensions that percentage rents would never be triggered would mean it expected no monetary consideration for the concession rights. In view of the terms of Agreement and the circumstances in which it was entered, we cannot accept that premise.

Finally, the Board reasoned that either SFO chose not to demand any compensation for the exclusive right to sell duty-free goods, or that the consideration it accepted could have been other provisions of the Agreements (such as limitations on the

27

types of goods DFS could sell or its management of the various subleases).  There is no extrinsic evidence that any of those other terms had significant, material value, however, or that they factored at all in the formulation of DFS's bid or in SFO's consideration of it.  The Board's interpretation was speculative, commercially unreasonable, and inconsistent with the evidence we have just discussed.  On this record, we conclude as a matter of law that the MAG was bid and accepted as consideration for both DFS's possessory interest and its exclusive concession right.

### D.  Analysis

In light of that conclusion, the Assessor's error here in capitalizing the full amount of the MAG is similar to the error made in *Service America*, where the assessor capitalized the full amount of the concession fee the taxpayer paid for the privilege of operating its exclusive food and beverage concession rather than impute a lower economic rent, because the fee also encompassed consideration for intangible business opportunities.

The County argues *Service America* is distinguishable, because what the assessor "did wrong" in that case "is that it used the corporation's *gross income* in estimating the market rent for the property," by "looking at past sales of the corporation and us[ing] a percentage of those gross sales to determine market rent."  According to the County, "the [a]ssessor's error was not in using the contract rent to capitalize under the income method, but in imputing a contract rent that was *based on the gross revenues of the taxpayer*."  "The use of gross sales was *key* to the court's decision in *Service America* because it necessarily captured the exclusivity component because it relied on the *profitability* of the corporation."

We disagree.  The assessor's error in *Service America* was in assuming that the entire concession fee represented compensation for rent.  As the court put it, "[t]he dilemma . . . is that there is no accurate way of separating the portion of the concession fee related to the use of property from the portion of the fee based on other considerations." (*Service America*, *supra*, 15 Cal.App.4th at p. 1237.)  Some of those

other considerations have no bearing here.[21] But one is directly pertinent: "the exclusive nature of its concession grant." (*Id*. at p. 1238.) There was undisputed evidence that the prices charged to stadium patrons, who had no alternative source of food or drink, were 30 percent higher than would be charged under ordinary circumstances. (*Ibid*.) The court reasoned, "[o]ne could conclude, therefore, that the basis for [the taxpayer's] willingness to pay a high concession fee *does not relate to its right to use property*, but rather depends upon its purchase of an exclusive sales prerogative—clearly an intangible right or benefit." (*Ibid*., italics added.)

The same is true here. The MAG, rather than percentage rents, is the price DFS paid for the bundle of rights it received from SFO. The evidence was undisputed that exclusivity was key to its duty-free operation. With the exclusive right, DFS could operate a highly profitable business. Without exclusivity and with competition, it could not. "One could conclude, therefore, that the basis for [DFS's] willingness to pay a high concession fee," here the $26.4 million MAG, "depends upon its purchase of an exclusive sales prerogative," which as noted in *Service America*, is "clearly an intangible right or benefit." And the foregoing analysis of the parties' contract, in light of surrounding circumstances, confirms that this is precisely what they did. Certainly, the MAG also includes compensation for DFS's right to use property. But here, as in *Service America*, it was error for the Assessor and the Board to use the entire lease and concession fee as the basis for valuation. (*Service America*, *supra*, 15 Cal.App.4th at p. 1240.)

Unlike in *Service America*, the taxpayer here does not contend that the Assessor's valuation improperly encompassed other intangibles (such as DFS's experience operating

---

[21] One problem was that the concessionaire's gross sales "[had] very little relationship to the use or occupancy of property" but, instead, were directly related to stadium attendance which depended primarily on the success of the professional sports teams that played there and the teams' public relations efforts. (*Service America*, *supra*, 15 Cal.App.4th at p. 1237.) Another was that its revenue derived not only from its use of the property but also from its value as a going business concern, with "competent management, a large cadre of employees, and substantial experience and 'goodwill' in the area of food service." (*Id*. at p. 1238.)

duty-free concessions, its assembled workforce or its license from Customs or ATF), and so we express no opinion on that subject. As in *Service America*, though, it is evident here that the price DFS was willing to pay for the rights it acquired under the Agreement was substantially greater than what it would have paid to rent space at SFO without the exclusive right to sell duty-free merchandise. By capitalizing the entire price, the Assessor directly taxed that exclusive right, which is forbidden by California law.[22]

As the courts have noted in these other cases, we do not hold that the Assessor may not consider, in valuing DFS's possessory interests at SFO, the attributes of the property that make it favorable to the business DFS is doing and to the other retail businesses that operate in the IT. (See *County of Los Angeles*, *supra*, 13 Cal.App.4th at p. 113.) There is, as the County points out, a captive audience of international travelers who arrive early to ensure they can clear security and thus have long "dwell times"[23] during which they can shop. SFO is also, as both parties have acknowledged, a gateway to travelers from Pacific Rim countries, many of whom have wealth and thus find the premier shopping experience SFO and its IT concessionaires offer attractive. All of this may be considered in valuing the possessory interests DFS has at SFO. That said, whatever value the Assessor attributes to that possessory interest may not result in employing as the income stream in its analysis the entire agreed-upon $26.4 million valuation of the combined leasehold and concession package DFS acquired under the Agreement.

_____

[22] The Assessor argued in the Board proceedings, and the County continues to argue here, that the MAG represents "fair market rent" based on evidence of comparable "duty-free leases at other international airports." But the uses of these "leases" as comparable possessory interests is based on the same flawed assumption the Assessor made in valuing DFS's interest: that the full amounts paid by the other duty-free concessionaires was consideration only for their possessory rights and did not include any consideration for their concession rights.

[23] "Dwell time" refers to "[t]he period between passenger check-in and departure time."

## III.

### *The Exclusive Duty-Free Concession Right Is Not a Taxable Attribute of the Real Property.*

Alternatively, the County suggests in passing that DFS's exclusive right to sell duty-free merchandise in locations SFO designated as duty-free is merely "an attribute of the real property that the Board may consider when determining fair market value" under section 110, subdivision (f). As noted, that provision states: "For purposes of determining the 'full cash value' or 'fair market value' of real property, *intangible attributes of real property shall be reflected in the value of the real property*. These intangible attributes of real property *include zoning, location, and other attributes that relate directly to the real property involved*." (§ 110, subd. (f), italics added.) Citing only to the statutory text, the County does not develop this argument or cite authority supporting it. It simply asserts that SFO's choice of the locations for duty-free shops is "akin to . . . zoning." We could hold that by failing to develop this argument the County has forfeited it. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2018) ¶ 9.21 [appellate court may treat as forfeited any issue that, although raised in briefs,, is not supported by pertinent argument or citation of authority].) However, DFS does not argue forfeiture and instead addresses the issue on the merits in its reply brief. We will therefore address it on its merits.

The County's construction fails to take account of, and is incompatible with, the literal language of section 110, subdivision (d)(3) concerning exclusive concession rights (quoted *ante*, pages 1–2). In relevant part, that provision defines the exclusive nature of a concession, franchise or similar agreement as "an intangible *asset* that *shall not* enhance the value of . . . real property." (§ 110, subd. (d)(3), italics added.) Subdivision (f), by contrast, mandates that "intangible *attributes* of real property *shall be* reflected in the value of the real property." (Italics added.) The only way to harmonize these provisions is to interpret an "intangible attribute" of real property that must be included in a fair market valuation as excluding those "intangible assets" that section 110,

31

subdivision (d)(3) places outside of bounds—including the exclusive nature of a concession or franchise right.

Even if DFS's duty-free concession right were not exclusive, moreover, our conclusion would be the same because, again, this issue is directly controlled by *Elk Hills* and the authorities it discusses.  Rejecting the contention that the emission reduction credits at issue there were "attributes of real property" within the meaning of subdivision (f), the Supreme Court in *Elk Hills* explained that " '[i]ntangible attributes of real property do not include licenses, franchises, and other rights to do business that are exercised in connection with the use of the real property.' "  (*Elk Hills*, *supra*, 57 Cal.4th at pp. 620–621.)  It differentiated such rights to do business from intangibles such as "location, zoning, view or architecture," because they " 'relate to the real property only in their connection with the business using it' " rather than entailing something that is an " 'integral part of and effectively define[s]' " the real property.  (*Id*. at pp. 620–621.)  And the case it quoted with approval on this point is illustrative:  *Shubat v. Sutter County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 794 (*Shubat*), a case predating section 110, subdivision (f)'s enactment, which held that a cable television company's franchise rights to do business as a cable company were not an "attribute" of its possessory interest in the underlying real estate it occupied (i.e., the company's public rights of way to lay cable equipment in the streets).  (*Shubat*, at pp. 803–804.)

These authorities are directly analogous.  The right to sell duty-free goods at SFO does not "relate directly to the real property" at SFO's IT, is not "an integral part of [that property]" and does not "effectively define it" any more than the right to sell cable service to subscribers defined the cable company's possessory interests in the public rights-of-way in *Shubat*.  On the contrary, it is a "right to do business that [is] exercised in connection with the use of the real property" at SFO.  Far from duty-free sales being the only possible use of the concourses in the IT, those same concourses host many other types of business in the very same area immediately adjacent to DFS's duty-free shops.  In that post-security area, there also is an array of restaurants, a wine shop, a bookstore,

news and gift stores, a perfumery, and numerous other kinds of merchandisers, all of which sell goods on a duty-paid basis.[24]

Finally, the County's analogy to zoning is at odds not only with the law but also logic. As DFS points out, the specification of certain areas as for duty-free retail is not an exercise of government police power, it is the product of contractual agreement by two sophisticated parties, each capable of negotiating mutually acceptable terms.

For these reasons, then, the County's use of the entire MAG to assess the value of DFS's possessory interest cannot be justified on the theory that the intangible exclusive right to sell duty-free goods is an attribute of DFS's possessory interest in the real property.

## CONCLUSION

The Agreement and other evidence reflect that the exclusive concession to sell duty-free merchandise at SFO was a significant factor in the MAG that DFS bid for the rights conferred by the Agreement. The right to use the post-security space in the new IT was also a significant component of that package. In valuing the possessory interests DFS acquired, the County may not include the entire value of, and thereby directly tax, the exclusive concession DFS also acquired. We do not mean to say the Board may not assume the existence of the concession right in valuing the possessory interest. But, as *Elk Hills* and other cases teach, assuming the presence of an intangible asset is not the same as including the entire value of the intangible asset in the unit being taxed. (*Elk Hills*, *supra*, 57 Cal.4th at p. 617 & fn. 10; see also *GTE Sprint*, *supra*, 26 Cal.App.4th at pp. 1002–1004, 1008; *Shubat*, *supra*, 13 Cal.App.4th at p. 804.) To avoid directly taxing DFS's exclusive concession, the Board must either value that right and separate it from the value of the possessory interest or impute a value to the possessory interest alone.

---

[24] The documents relating to the RFP, which we have already described, make plain that SFO desired not one kind of business to occupy that space, but a wide *variety*. (See also Pub. Util. Code, § 21690.7 [directing governing bodies of publicly owned airports to promote commerce and tourism in granting airport concessions by "securing a diversity of airport services" and "avoiding wasteful duplication of such services"].)

(*GTE Sprint*, at p. 1007 [exclude value of intangible rights when assessing tangible property]; *Service America*, *supra*, 15 Cal.App.4th at p. 1242 [use imputed value to determine fair rental value for real property].)

Because the Board used the entire MAG as the income stream for its capitalization analysis and failed to separate the portion of that MAG paid for the real property and intangible interests, it is necessary to return this matter to the Board for a reassessment hearing. The Board may reopen the record to allow the parties to present additional evidence on valuation of the intangible and possessory interests at issue.

Because DFS and the County disagree as to whether the Board erred in largely rejecting the expert testimony of DFS's possessory interest expert, Runde, and that of its intangible interest valuation expert, O'Connor, we make some observations that may serve as guidance. Some of the criticisms leveled at Runde's valuation related to the difficulty of finding properties comparable to the relatively unusual property at issue here. However, it can be difficult to value unusual or unique properties, and therefore considering comparable values for properties that are not precisely similar may be appropriate even if not alone dispositive. (See *Service America*, *supra*, 15 Cal.App.4th at p. 1242.) Further, no attempt at valuing a unique or unusual property will likely be precise or flawless. The fact that precisely similar comparable properties may not exist, or that valuation information may not be available for comparable properties, is not the fault of the parties or the experts. These may simply be unavoidable realities. Nor is it a simple matter to "separate[e] the portion of the concession fee related to the use of property from the portion of the fee based on other considerations." (See *id*. at pp. 1237–1240.) These challenges, too, ought to be considered in evaluating expert attempts at valuation. Finally, some of the Board's criticisms of DFS's expert valuations were rooted in the Board's mistaken reliance on "rents" paid by duty-free operators at other airports without considering that such "rents" presumably, as here, represent consideration not only for real property but for intangible concession rights. With all of this in mind, we encourage the Board to revisit the valuation evidence offered by DFS in light of our holding that the MAG was consideration for DFS's exclusive concession as

34

well as its possessory interest.  Since it concluded (erroneously) otherwise, the Board was not called on to determine the value of the intangible concession right or to separate it from the value of the real property interest, a task which it must on remand undertake.

## DISPOSITION

The trial court erred in affirming the Board's decision.  Accordingly, we reverse its judgment and remand to that court for further proceedings consistent with this opinion. Appellant is to recover costs on appeal.

_____

                    STEWART, J.


We concur.


_____
KLINE, P.J.


_____
MILLER, J.


*DFS Group, L.P. v. County of San Mateo* (A150162)


36

Trial Court:   San Mateo County Superior Court

Trial Judge:   Hon. Steven L. Dylina

Counsel:

Greenberg Traurig, C. Stephen Davis, Cris K. O'Neall, Andrew W. Bodeau, for Plaintiff and Appellant.

John C. Beiers, County Counsel, Rebecca M. Archer, Deputy County Counsel, for Defendant and Respondent.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Defendant and Respondent.